**UNITED STATES of America, Appellee,**

v.

**Leland Earl DART, Appellant.**

**No. 84–5050.**

United States Court of Appeals, Fourth Circuit.

Argued July 13, 1984.

Decided Nov. 1, 1984.

Michael S. Scofield, Charlotte, N.C. (Lisa G. Caddell; Wardlow, Knox, Knox, Freeman & Scofield, Charlotte, N.C., on brief), for appellant.

Harry L. Hobgood, Asst. U.S. Atty., Greensboro, N.C. (Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., on brief), for appellee.

Before PHILLIPS, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Leland Earl Dart appeals from the district court's denial of his motion to suppress the seizure of unregistered automatic weapons discovered during a search of a mini-warehouse facility in Greensboro, North Carolina. Because we believe that the search was constitutionally defective, we reverse the decision of the district court.

### I.

In September of 1982, Dart signed a lease for the rental of storage Unit 69 at Colonial Self Storage in Greensboro, North Carolina. The unit was ten feet by twenty feet and was located, with other units, in a fenced area. A metal, garage-like door provided the only entrance to the unit. The door was secured with a lock for which only Dart had a key. In the warehouse Dart placed numerous pieces of personal property. Among the possessions was an extensive collection of guns.

On the evening of August 18, 1983, the Colonial Self Storage Warehouse complex was burglarized. Officer Donald Johnson of the Greensboro Police Department received a call at 7:00 A.M., August 19, 1983, reporting the break-in. When Officer Johnson arrived at the complex he immediately surveyed the storage facilities to determine where the entry had occurred and to see if any of the burglars were still on the premises. Around the perimeter security fence Johnson found several items he surmised had been dropped by the burglars while fleeing from the area. Within the complex itself Johnson discovered that the locks on approximately ten of the storage units had been sawed off and that the roll-down, garage-like doors on these units had been forced open. Johnson briefly entered several of the burglarized units to see if the burglars were still present and to ascertain whether anything had been taken.

When Johnson reached Unit 69 he noticed that the lock had been sawed off and the door forced open approximately three feet. Johnson pushed open the door the

rest of the way and entered the unit. Inside he found a 1963 red Corvette and "a pile of something in the back covered up, but [he] didn't know what it was." (J.A. 16). Noticing that dust on the car had been recently disturbed, Johnson quickly decided to go back to his car and retrieve his fingerprint kit. Before he left the unit, though, Johnson checked around the interior of the mini-warehouse to see if anyone was present. (J.A. 14). Satisfied that there was no one in the warehouse, Johnson returned to his car to get the fingerprint tools.

Once back inside, Johnson began to lift fingerprints from the Corvette. As he worked his way to the rear of the car, Johnson for the first time noticed an "old weapon" lying on top of the blanket-draped pile in the rear of the unit. Upon further inspection Johnson concluded that it was an antique handgun in questionable working order. Johnson then noticed two leather pouches lying on the ground near the concealed stack. According to Johnson the pouches were "shaped like something that would house a handgun." JA at 19. Johnson opened the pouches and found a fully loaded .357 "magnum" and a fully loaded .357 "trooper special." "Out of curiosity", (J.A. 20), Johnson proceeded to lift up the blanket. Underneath he saw "butts of rifles" and concluded that he had discovered a cache of stolen weapons. He did not see any automatic weapons. Leaving the weapons undisturbed, Johnson then replaced the blanket and left Unit 69 to confer with other officers who had arrived at the warehouse.

Johnson reported the find to two of his colleagues (Bunker and Blair) and gave them a tour of the burglarized warehouses. After twenty minutes the trio returned to Unit 69 to take a closer look at the weapons stack. Johnson showed Blair and Bunker the handguns and then pulled back the blanket so they could see the stack of rifles. Johnson then left for ten minutes and when he returned Bunker and Blair showed him the contents of a camouflaged case that they had opened. All three men agreed that the case held an automatic weapon with a silencer. At this point Officer Bunker decided to call for expert intelligence assistance. The search was temporarily halted while the officers waited for reinforcements.

At 10:30 A.M. a team of weapons experts from the Greensboro police force and the Bureau of Alcohol, Tobacco and Firearms resumed the search. Each one of the weapons was removed from the stack, examined, and inventoried. In all, nearly 300 weapons were uncovered. Some of the weapons were still packed in the original boxes in which they had been bought. Others were wrapped in pillowcases or concealed in leather pouches. By the time the search of the stack was complete, the officers had found five fully automatic unregistered weapons and two M-1 conversion kits. Up to this point the officers had been operating without a warrant of any kind.

At 12:15 P.M., after the stack had been fully disassembled, Officer Blair left the warehouse to obtain a search warrant authorizing a search of the remainder of the warehouse. Blair listed the automatic weapons uncovered in the stack as probable cause to search for additional weapons. Within two hours a warrant was issued. The warrant authorized a search of Unit 69 in its entirety for "weapons of mass death and destruction." The search that then ensued produced one additional unregistered automatic weapon. It had been stored inside a locked vault that police locksmiths pried open.

Three months after the search, Dart was indicted on eight counts of possessing an unregistered automatic weapon in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. Dart filed a motion to suppress the guns, which was denied. Dart then pleaded guilty to one count of unlawful possession of an automatic weapon on the condition that his right to appeal the constitutionality of the search be preserved. Pending the outcome of this appeal, Dart was sentenced to five years in prison and a $10,000 fine.

## II.

The fourth amendment proscribes all unreasonable searches. *Mincey v. Arizona,*

437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). "Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The district court held, and the government argues on appeal, that two of these exceptions—the "exigent circumstances" exception and the plain view doctrine—are applicable here. We disagree. In our view neither exception justified the government's failure to obtain a warrant before lifting the blanket and disassembling the stack of weapons.

### A.

Under certain "exceptional" or exigent circumstances law enforcement officers need not obtain a warrant before searching a private dwelling. Where, for example, officers are responding to an emergency, *see, e.g., United States v. Jeffers*, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948), are in hot pursuit of a fleeing felon, see, *e.g., Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), or are confronted with imminent destruction of evidence, see, *e.g., Schmerber v. California*, 384 U.S. 757, 86 S.Ct.

1826, 16 L.Ed.2d 908 (1966), the Supreme Court has ruled that warrantless searches do not violate the fourth amendment. The exigent circumstances exception has also been extended to situations in which police officers believe a killer is still at the scene of a homicide, *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978), or where "there is a need to protect or preserve life or avoid serious injury." *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir.1963), quoted in *Mincey*, 437 U.S. at 392–93, 98 S.Ct. at 2413–14. *See generally*, Lafave, *Search and Seizure*, §§ 6.5(b)(c)(d) and (e) (1978).[1] As a general rule "the burden rests on the State to show the existence of such an exceptional situation." *Vale v. Louisiana*, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Unquestionably Officer Johnson's initial warrantless entry into Unit 69 did not violate the fourth amendment. The warehouse had clearly been burglarized, and Johnson had reason to believe that the perpetrators were still on the premises. Personal safety, therefore, required a cursory look in the burglarized units. *Mincey* at 392–93, 98 S.Ct. at 2413–14.

It is apparent from the record, however, that Johnson's decision to look under the blanket was not motivated by fear for personal safety and was entirely unrelated

---

**1.** Even where a warrant might be required, a defendant may not be successful in raising a fourth amendment defense if he cannot establish a legitimate expectation of privacy in the object or area searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980); *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978).

In this case the government did not raise the standing issue in its brief, although it did suggest in oral argument that the intervening action of a third party—the burglars—destroyed any expectation of privacy enjoyed by the defendant. The district court agreed with the government. We flatly reject this argument. First, the expectation of privacy that the defendant had in his locked, mini-warehouse is indistinguishable from that which we accorded the defendant in *United States v. Shepherd*, 714 F.2d 316, 320 (4th Cir.1983) (padlocked shed near

home protected by fourth amendment). In our view the expectation of privacy that Dart had in the warehouse was analogous to the expectation of privacy he had in his home. Second, were we to accept the government's position, the fourth amendment would, for all practical purposes, have no application to any dwelling or property that became the scene of a crime. The Supreme Court has held precisely to the contrary. *See, e.g., Mincey v. Arizona*, 437 U.S, 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *Michigan v. Clifford*, — U.S. —, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984). Applying the teachings of these cases, we conclude that Dart had the same expectation of privacy in the covered stack of weapons that the defendants in *Mincey, Clifford* and *Tyler* had in their respective possessions.

to the initial search he made to determine if any of the burglars were still on the premises. Johnson testified that when he first entered Unit 69 to look around he noticed the blanket-draped stack against the far wall. (J.A. 16). Johnson did not bother to examine the stack for a hidden burglar. To the contrary, Johnson testified that when he left to retrieve the fingerprint kit he had concluded that there was nobody in the warehouse:

> A. Hadn't you satisfied yourself before you went back and got your kit and devoted your attention to processing the Corvette for prints, that there was nobody in that area, in Storage House 69?
>
> A. Yes, to a certain degree.
>
> Q. You hadn't called for any other officers?
>
> A. Not at that time.
>
> \*    \*    \*    \*    \*    \*
>
> Q. When you first got there, did you basically go around to all of the places that appeared to be broken in and kind of survey the scene with Mr. Huffman?
>
> A. Some of them, yes, and some of them not. Basically we surveyed the whole general area, but as far as the searches were concerned, you know, to see if there were any perpetrators there or anything missing. Basically I made those.

(J.A. 20–21).

Johnson had, in fact, been dusting the Corvette for some time—fully aware of the stack at the back of the warehouse—before he decided to look underneath the blanket. Had the stack been a cause for concern during that time, surely Johnson would not have remained in the warehouse working on the Corvette alone without calling for assistance or taking a closer look. Johnson's attention was drawn to the stack not because of a fear of ambush, but because he spotted an antique handgun lying on the blanket that piqued his curiosity. The presence of an old handgun lying by itself could not—without more—have created an "exceptional" or emergency situation. In our view, therefore, Johnson's own actions demonstrate that if exigent circumstances existed when he first entered the warehouse, they had long since evaporated by the time the blanket was lifted.[2]

The government also insists that exigent circumstances justified the second search of the stack that occurred when Johnson returned to Unit 69 with Officers Bunker and Blair. We find this position preposterous. When Johnson returned with the other officers he had already established that no one was hiding in or behind the weapons stack. Indeed, had Johnson and the others been genuinely concerned about hidden burglars in Unit 69, they would not have taken twenty minutes for a leisurely tour of the warehouse complex before returning to the weapons collection. Once Johnson knew the stack posed no immediate danger, he could have had the unit guarded and left to obtain a warrant. There simply was no immediate need for the Bunker-Blair search.

■ Furthermore, even if Officers Johnson, Bunker, and Blair had acted properly in removing the blanket under the exigent circumstances exception, they would not then have been entitled to open sealed packing crates or zippered pouches found in the pile. The situation facing the police here was no different than that in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), where the Supreme Court ruled that the lawful search for a killer at a homicide scene could not be extended to include the search of dresser drawers and closed containers.[3] *See also*

---

2. At one point during cross examination Johnson testified that he looked under the blanket because "someone . . . could have jumped out and endangered me in some form or fashion." (J.A. 20). In light of Johnson's other statements and actions, we do not find this statement credible. The district court clearly erred in relying on this small piece of self-serving testimony to conclude that Johnson acted under the pressure of exigent circumstances.

3. We note, of course, that for the sake of this argument we have assumed that the first search of the weapons stack was lawful under *Mincey*. We reiterate, as explained *supra* at 267–268, that our ruling today does not concede this

*Michigan v. Clifford,* —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984); *United States v. Presler,* 610 F.2d 1206 (4th Cir. 1979). None of the weapons for which Dart was indicted were immediately visible once the blanket was removed. At best, therefore, the discovery of the unpackaged rifles underneath the blanket would only have given the officers probable cause to obtain a search warrant to look in the crates, boxes, pouches, pillowcases, and other hidden areas where the illegal weapons were found.[4]

### B.

■ During the course of "legitimate emergency activities" the police may seize any evidence that is in plain view. *Mincey* 437 U.S. at 393, 98 S.Ct. at 2413, see also *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). The plain view doctrine, in turn, may only be applied when the officer is legitimately in a position to view the object, the evidence is discovered inadvertently, and the incriminating nature of the contraband is "immediately apparent." *Texas v. Brown,* 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983).

■ None of the weapons were seized properly under the plain view doctrine. The weapons discovered underneath the blanket were not discovered inadvertently because the blanket was opaque and the removal of the blanket constituted a deliberate act that was outside the scope of a lawful warrantless search. Moreover, it was not immediately apparent that any of the weapons first seen in the stack were unregistered or stolen. The handgun found on top of the stack was, of course, discovered inadvertently, but like the guns seen underneath the blanket it was not immediately apparent[5] to Officer Johnson that the handgun was stolen or illegally possessed.[6]

■ Similarly, the .357 "trooper special" and the .357 magnum that Johnson discovered by looking through an opening in the stack, (J.A. 19), were not in plain view. The weapons were not discovered inadvertently because they were concealed in zippered leather pouches that, at first glance, were not unmistakably gun cases. Johnson testified that they were shaped only "like something that would house a gun." *Cf. Texas v. Brown,* 460 U.S. at 742, 103 S.Ct. at 1543, 75 L.Ed.2d at 514 (balloon tied in particular manner was uniquely distinctive of narcotics packaging). In addition, Johnson testified that there was nothing "immediately apparent" about the

point. We do not believe that under *Mincey, Clifford,* or *Tyler* the initial "exigent" entry into Unit 69 justified even the first look under the blanket.

4. Not all of the illegal weapons were found in closed containers. Two of the weapons—the MP–40s—were loose within the stack. (J.A. 76). This fact, however, makes little difference, for none of the weapons was visible when the blanket was removed. Rummaging for the weapons in the stack, therefore, was no more proper here than rummaging in a dresser drawer would have been in *Mincey.* Thus, assuming that the lifting of the blanket was proper in the first instance, the officers would still have needed a warrant to look for any weapons concealed in the stack.

5. Q: Was it immediately apparent to you that that gun was stolen?
A: No, it wasn't.
Q: In fact, it turned out I guess, you checked the serial number with someone?
A: Not that I recall.

Q: Was it immediately apparent to you that that first handgun you saw, the old one, was evidence of some crime?
A: No, it wasn't immediately apparent.

6. The government cites *United States v. Johnson,* 506 F.2d 674, 676 (8th Cir.1974), *cert. denied,* 421 U.S. 917, 95 S.Ct. 1579, 43 L.Ed.2d 784 (1975), for the proposition that once a policeman lawfully discovers one weapon, he is entitled to search for other weapons without a warrant. *Johnson* is factually distinguishable from the present case. In *Johnson,* a policeman stopped a car and saw a sawed-off shotgun in the back seat of the car. He then searched the passenger area of the car and discovered another sawed-off shotgun in the front seat area. The exigent circumstances attendant to the discovery of a sawed-off shotgun in an automobile are very different than discovering an old handgun in an unoccupied garage.

weapons found in the pouches to indicate they were illegal.[7]

Our conclusion that the plain view doctrine is inapplicable to this case is supported by a recent decision of this court, *United States v. Presler*, 610 F.2d 1206 (4th Cir.1979). In *Presler* we ruled that the contents of a closed, plastic box found during an "exigent circumstances" search of an apartment were not in plain view because it was not immediately apparent that the box held contraband or that the box was connected with the crime that had occurred. 610 F.2d at 1210–11. Likewise, here there was no evidence that the blanket-draped stack and the handgun lying on the blanket were connected with the burglary being investigated or constituted some form of contraband.[8]

In sum, neither the warrantless search of Unit 69 nor the seizure of weapons found in and around the covered weapons stack was justified under the carefully defined exceptions to the warrant requirement. Failure to obtain a warrant before searching for or seizing any of the weapons, therefore, constituted a clear violation of Dart's fourth amendment rights.

### C.

■■■ Of the eight illegal weapons found in the warehouse, one was found later in the day after the police had obtained a search warrant to look for "weapons of mass destruction." Possession of the warrant, however, did not legitimate this search. The warrant was issued on the basis of tainted evidence and thus was invalid. *United States v. Langley*, 466 F.2d 27 (6th Cir.1972) (where tainted information comprises more than a "very minor portion" of that found in an affidavit supporting a warrant to search, the warrant must be held invalid); *see James v. United States*, 418 F.2d 1150 (D.C.Cir.1969) (search warrant based on evidence obtained in prior illegal search invalid unless warrant could have been issued based on untainted information in affidavit); *see also United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) (evidence obtained from wire interception suppressed where order for interception based on earlier invalid wiretap). The fruits of that search, therefore, are not admissible.

### III.

The shoddiness of the police practices and the callous disregard for constitutional principle reflected in this case are appalling. After the officers had checked the premises to determine that there was no threat to their personal safety it would have been a simple matter to secure either the entire complex or Unit 69 alone and then apply for a search warrant. The stack of weapons in Unit 69 was not mobile and experienced officers should have known that it would not take long to obtain a warrant. A warrant was in fact obtained later that day within the space of several hours. Moreover, if the officers believed in good faith that they had stumbled upon stolen weapons and that, therefore, their extended search was justified under the

---

7. Q. You opened the pouch of the first handgun. Was there anything illegal about the handgun?
   A. Not that I could see readily.
   Q. Did you open some other pouches?
   A. There were only two pouches that I opened.
   Q. What was in the second pouch?
   A. One had a .357 Magnum and I think one had a .357 trooper special. One had a five or four inch barrel and one had a six inch barrel.
   Q. Was there anything illegal about that second firearm that you found in the pouch?
   A. Not that was immediately—nothing that was visually, you know—
   Q. Nothing that was immediately apparent?
   A. Right.

8. When Johnson began to investigate the stack of weapons he had effectively begun to investigate a second crime—one involving the possession and storage of illegal weapons in the warehouse, not the burglarization of Unit 69 and the asportation of goods away from the warehouse. Once the search of the stack was well underway Johnson and his colleagues apparently concluded that the weapons were not so much stolen as illegal. Thus, by the time the stack was disassembled the investigation of a *third* crime had begun. This fact makes it even more difficult for the government to argue that the alleged plain view seizure of the weapons was, under *Presler*, within the scope of the initial lawful exigent circumstances entry into Unit 69.

plain view doctrine, we fail to understand why no efforts were made to call in the serial numbers to determine if the weapons really were stolen or unregistered. A "positive" response from police headquarters would have provided the needed probable cause for a warrant, and a negative response would have been a clear warning signal to a conscientious officer that the search had gone too far and that a warrant would be needed before further investigation took place.

Most disturbing of all, we are not convinced that the officers were unaware of their constitutional responsibilities. Inexplicably, a warrant was obtained once the worst of the damage had been done. It is inconceivable to us how experienced police officers could believe that they did not need a warrant to break open wooden packing crates found in the weapons stack, but did need a warrant to open packages and metal vaults found later in the same afternoon.

The fourth amendment's protections against unreasonable searches and seizures are among the most cherished of the rights guaranteed by the Constitution for the simple reason that they are indispensable to the preservation of a free society. The manner in which we choose to interpret and abide by the single, simple sentence of that amendment will inevitably determine the type of society we live in. Only scrupulous adherence to the letter of case law and constitutional precedent will protect against the day when the right to privacy is fatally eroded by the ever increasing demands of law enforcement. It is for this reason that we find the government's casual disregard of fourth amendment principles so disquieting.

Police safety, effective law enforcement, and the protection of individual privacy rights are not incompatible goals. This case affords a perfect example of that truth. Had the law enforcement officers exercised sufficient restraint to secure the premises and wait for a warrant after completing their initial search for the burglars, the end result desired by the state could have been achieved without doing violence to the constitutional principles so critical to the future existence of our free society.

REVERSED.