UNITED STATES of America, Plaintiff-Appellee,

v.

Jose Antonio GONZALEZ, Defendant-Appellant.

No. 84–1603.

United States Court of Appeals, Tenth Circuit.

May 24, 1985.

Jack G. Goldberg, New York City, for defendant-appellant.

Mark D. Jarmie, Asst. U.S. Atty., Albuquerque, N.M. (William L. Lutz, U.S. Atty., and Larry Gomez, Asst. U.S. Atty., Albuquerque, N.M., with him on briefs), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and LOGAN and SEYMOUR, Circuit Judges.

LOGAN, Circuit Judge.

Defendant Jose Antonio Gonzalez appeals from his conviction after a guilty plea of knowingly and unlawfully possessing, with the intent to distribute, a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Pursuant to Fed.R. Crim.P. 11, the court permitted defendant to preserve for appeal the denial of his motion to suppress evidence. He contends on appeal that the search of his automobile, which revealed the cocaine, was illegal.

A state patrolman stopped the car defendant was driving in New Mexico on Interstate 40 at 9:00 p.m. in January 1984 for a speeding violation. As the officer approached the vehicle, which contained defendant and a woman passenger, defendant stepped out of the car. The officer noticed an "extremely strong odor of some kind of deodorizer" which he testified at the suppression hearing is often used to mask the odor of narcotics. Defendant gave the officer a valid New York state driver's license as well as a valid California registration and a valid, though unsigned, California car title document. While defendant waited at the roadside, the officer stopped another car, issued a warning to that driver, and let that car proceed. Defendant, in response to the officer's questions, stated that he was going to a Holiday Inn in Albuquerque to give the car to the owner. The defendant, however, could not name the car's owner or tell the officer how to get in touch with that owner.

The officer, who retained the driver's license, the registration, and the title, asked defendant to follow him to the state police office three to four miles away. The officer testified at the suppression hearing that the purpose of the trip was to verify that the car was not stolen and for their "safety and protection" from oncoming traffic. He also testified that he suspected defendant was engaging in other criminal activity aside from the traffic violation, although he was unable to articulate particular facts—other than the deodorizer smell and the unusual combination of automobile license, registration, and title documents—

that might give rise to a finding of probable cause. In the few minutes it took to drive to the state police office, the officer received word on his car radio that there were no warrants outstanding against defendant and that the car had not been reported stolen. At the police office, the officer prepared the speeding citation as well as a consent to search form. After issuing the citation and while retaining the car documents, the officer asked defendant to sign the consent form. Defendant signed the form. The search of the car revealed approximately eighty pounds of cocaine underneath the rear seat and in the side wall panels. Defendant claims that the officer detained him for approximately twenty minutes. Defendant was arrested after the search.

Following a suppression hearing, the district court determined that the stop was proper; that the defendant was not free to leave; that the officer was justified in detaining the defendant and exploring the possibility of a stolen car; and thus, that there were reasonable, articulable grounds for detaining defendant for a reasonable length of time to investigate the ownership of the car. The court also determined that the officer had smelled deodorizer in the car; that deodorizers are often used to mask the scent of narcotics; and that those facts, together with the car documentation, gave the officer articulable reasons to suspect that there were narcotics in the car and to make him want to search the car. It also found that defendant voluntarily and freely executed the consent to search. Nevertheless, the court specifically declined to find that the officer could have searched the vehicle on the basis of the information he had at the scene of the stop. The following exchange on this subject took place between defense counsel and the court:

"MR. BENAVIDEZ: Is the Court finding that the officer could have searched the vehicle with what he had at the scene of the stop?

THE COURT: I did not say that.

MR. BENAVIDEZ: Okay.

THE COURT: I did not say that. I said he had reasonable articulable grounds to detain the Defendant briefly and ask him to come back to Moriarty where they could see whether a consent to search could be obtained and, indeed, was obtained. I say he absolutely had grounds to return him to Moriarty in connection with the traffic—not the traffic violation but the ownership of the car and all of the other circumstances."

R. IV, 9–10.

Defendant contends on appeal that he was seized in violation of the Fourth Amendment, that his consent to search was the product of an unlawful arrest, and that, therefore, the subsequent seizure of the cocaine was unlawful. He concedes that the initial stop for speeding was lawful and that the limited detention for the purpose of issuing a speeding citation was proper. The government does not contest the court's finding that after the officer stopped defendant he was not free to leave.

■ Although we asked for and the parties have provided supplemental briefs on whether the New Mexico state police officer had probable cause at the time of the traffic stop either to arrest defendant or search his car, we are unable to discern sufficient facts here to support such probable cause. *Cf. Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam) (suspicion based on circumstances common to many innocent travelers did not support probable cause). We do not consider the proper parameters of a drug courier profile because the police officer here specifically denied that he was using any such profile. Instead, the officer stopped the defendant solely because he was speeding. In the course of his roadside conversation with defendant the officer smelled a deodorizer, which the officer said indicated to him that defendant was committing more than just a traffic violation. But the officer could not articulate facts that gave him a more specific cause for suspicion to justify a search. He just had bad intuitions about this driver, which later proved entirely correct.

Part of the officer's suspicion arose from the unusual combination of a driver bearing a New York driver's license, in a car with California plates and registered to a California owner, carrying an unsigned title, and headed for a Holiday Inn in Albuquerque to meet with an unknown owner at an uncertain time. We would unduly hamstring police officers if we told them they must turn their back on such bizarre circumstances. These facts obviously raise a reasonable suspicion that the car might be stolen and they warrant detention of a suspect for a reasonable time while the officer checks the car's ownership. The police officer had a car radio and contact thereby with dispatchers who had instant access to the National Crime Information Center (NCIC) computer records that could quickly resolve, with reasonable certainty, whether there were warrants outstanding against the driver and whether the car had been reported stolen. The officer here

availed himself of these modern techniques and received a negative answer to his queries about the car in less time than it took to drive the three to four miles to the station office. Had the officer remained with defendant on the side of the highway, as is customary in routine traffic stops, he could have issued his speeding ticket and obtained all available information about the suspected car theft in a matter of minutes.[1]

■ If the officer still had thoughts that defendant had done something else illegal he could have asked defendant for consent to search the car then and there. *See Schneckcloth v. Bustamonte,* 412 U.S. 218, 228, 232, 93 S.Ct. 2041, 2048, 2050, 36 L.Ed.2d 854 (1973) (consent searches "may result in considerably less inconvenience for the subject of the search," and they "normally occur on the highway, or in a person's home or office, and under informal and unstructured conditions."). Had

---

**1.** In New Mexico the officer must notify a violator charged with a minor speeding violation of an option to acknowledge guilt by signing the penalty assessment notice, thereby entitling the violator to pay the predetermined fine by mail within thirty days. N.M.Stat.Ann. §§ 66–8–116, –117, –123. The law, or at least established custom, is that a violator who signs acknowledging guilt and promising to pay by mail is immediately released and not required to go to a state police office.

The New Mexico statutes use the word "arrest" to describe the events that occur when a police officer issues a speeding ticket to a violator. *See id.* § 66–8–117, –123. Thus, in a technical sense, defendant here was arrested. But, as noted above, the statute defines the narrow scope of this limited purpose arrest and commands that the officer "release [the arrested person] from custody" if he will sign the agreement to appear and accept the citation, unless the offense is one listed in N.M.Stat.Ann. § 66–8–122 that requires an immediate appearance before a magistrate. *See id.* § 66–8–123(A) & (B). Defendant's speeding violation was a "penalty assessment misdemeanor" for which such immediate release from custody ordinarily would have been required.

Despite the statute's use of the words "arrest" and "custody," when a New Mexico police officer stops a car merely to issue a traffic summons for a minor speeding infraction, we think that for Fourth Amendment purposes that stop is more in the nature of an investigative detention than a traditional arrest. *See, e.g., Pennsyl-*

*vania v. Mimms,* 434 U.S. 106, 109–11, 98 S.Ct. 330, 332–34, 54 L.Ed.2d 331 (1977) (per curiam) (analyzing reasonableness of police conduct during a traffic stop for driving with expired license plates in terms of *Terry v. Ohio*); *cf. United States v. LeQuire,* 424 F.2d 341, 343–44 (5th Cir.1970) (no Miranda warning need be given to person during routine stop for speeding). In *Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979), the Court explained how a *Terry* stop-and-frisk is a specially limited, *sui generis* intrusion into a person's Fourth Amendment rights as compared with a traditional arrest.

The distinction matters here because the label used for constitutional purposes defines the scope of reasonable police conduct incident to such a stop. If such a traffic stop were like a traditional custodial arrest, then as part of the search incident to arrest the apprehending officer could search the entire passenger compartment, *see New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). But if, as we conclude here, the traffic stop only amounts to an investigative detention, the officer's freedom to search is more limited; his motivation for the search must be related to concern for protecting himself or others rather than any concern with preserving evidence. *See Michigan v. Long,* 463 U.S. 1032, 1049 & n. 14, 103 S.Ct. 3469, 3480 & n. 14, 77 L.Ed.2d 1201 (1983). The government has not argued that such a protective search, conducted at the scene of the original detention, would have revealed the contraband found in the car defendant was using.

defendant refused to consent the officer would have been put to the choice of arresting defendant in order to conduct an involuntary search or letting him go. An arrest or search would require facts giving rise to probable cause. We construe the district court's findings to mean that there was not probable cause for such a search. The government has presented nothing that convinces us this finding was incorrect.[2] Therefore we must confront whether the officer's request to have defendant accompany him to the police station, and once there whether his request for consent to search defendant's car, were acceptable as part of a valid *Terry* stop detention. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Two recent Supreme Court decisions are dispositive of this question. In *United States v. Sharpe*, — U.S. —, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Court declined to impose any per se rule for the acceptable length of a *Terry* stop and instead held that the length of the stop must be reasonable under the circumstances. *Id.* at —, 105 S.Ct. at 1575. We cannot disagree with the district court's conclusions here that the length of this officer's stop was reasonable. Although the police officer equivocated about the time elapsed from the initial stop to the incriminating search, it clearly lasted only a short while.

Nevertheless, as the Court specifically noted in *Sharpe*, it did not have before it any challenge to the reasonableness of the detaining officer's conduct other than the length of the detention. — U.S. at —, 105 S.Ct. at 1573. Therefore the Court distinguished, but did not discredit, decisions such as *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), and *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). *See Sharpe*, — U.S. at —, 105 S.Ct. at 1573.

Consequently, this case is controlled by another Supreme Court decision released the same day as *Sharpe*: *Hayes v. Florida*, — U.S. —, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), which clarifies the holdings of *Dunaway, Royer, Place*, and an earlier case, *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969). *Hayes* involved a challenge to the reasonableness of a *Terry* detention in which the police officers convinced a person to accompany them voluntarily to the police station to provide fingerprints. Although the officers in *Hayes* lacked either a warrant or probable cause, one of them indicated that they would arrest Hayes if he refused to come with them. — U.S. at —, 105 S.Ct. at 1645. Hayes chose not to call their bluff. The officers placed him under arrest at the station once they concluded that

**2.** The arresting officer testified that in nine previous cases he had smelled deodorizer in automobiles and in all of them he had found drugs. But he did not testify that the smell of deodorizer was an unequivocal signal that led him to believe this car carried drugs. The exchange at this point was as follows:

"Q. [Defense counsel] Well, sir, you were there. I'm asking you now, when you pulled that car over, you got that whiff, as you say, of deodorizer, is that when you—Did you then say to yourself obviously, 'I may have one here'?

A. [Officer Toler] I'm not saying whether I did or whether I didn't. It was just an awful strong smell. The thought occurred to me there might be something.

Q. And sitting here right now, are you telling us now, you remember that the thought did occur to you out there on that highway?

A. That there might be something in the vehicle. (Witness nods head affirmatively.)

Q. Well, when you say 'something,' you're talking about drugs.

A. I said something.

Q. Well, did you believe, sir, that there might be something in the vehicle or there might be narcotic drugs in the vehicle?

A. There might be something illegal in the vehicle.

Q. Sir, did you believe there might be something illegal like cigarettes or narcotic drugs? It's a simple question.

A. I just told you, the only thing that went through my mind was that there might be something illegal in the car, and that's what you're asking me, and that's the thought that went through my head."

R. III, 37–38.

his fingerprints matched those of their suspect.

The Supreme Court reversed Hayes' conviction based on the fingerprint evidence, concluding that the officers' seizure of Hayes was sufficiently like an arrest to require the traditional threshold of probable cause, which it concluded had not been met. *Id.* at ——, 105 S.Ct. at 1645. The Court distinguished *Sharpe* as a case that did not involve "the involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting...." *Id.* at ——, 105 S.Ct. at 1645. The Court held that the line between brief detention and full-fledged arrest is crossed when the police "forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." *Id.*

Our case falls directly within *Hayes'* ambit. Although the New Mexico police officer did not use physical force to remove defendant from the highway, where defendant had a right to be, he did coerce defendant using means no less forcible than those in *Hayes*. The officer had defendant's driver's license, car registration, and title at the time he "asked" defendant to follow him to the station. As the district court found, defendant had no reasonable choice other than to accompany the officer no matter how polite the officer was in phrasing his request. Thus the officer's

conduct was as coercive as the threat to arrest made in *Hayes*.

The dissenting opinion would find the officer's conduct coercing defendant to make the trip to the police office to be reasonable under all of the circumstances. *See United States v. Hensley,* —— U.S. ——, ——, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985) (balance intrusion on personal security against importance of the governmental interests alleged to justify the intrusion). In so concluding the dissent stresses the compelling governmental interest in detecting illegal drug trafficking, and the lone officer's predicament at night dealing with two suspects in their car.[3] Although not specifically characterized as such, we think the dissent's approach is an exigent circumstances argument.[4]

We do not believe that suspicion of drug trafficking—not rising to the level of probable cause to arrest—justifies a different *Terry* stop standard than that appropriate in any situation in which a suspect may be armed. We empathize with the officer's dilemma when while working alone at night he stops a suspect—or two suspects—in a car in a remote area and has reasonable suspicion that the car may contain contraband. The officer's natural desire is to conduct a search of the vehicle in the safe environs of a police station in the presence of other officers. But we do not consider the situation of a lone officer, two suspects, or nighttime, or all three together, as constituting exigent circumstances justifying the forced accompaniment to the police station.[5]

---

**3.** The trial judge, justifying his ruling that the officer's actions were lawful, stressed the "problems on the side of a very busy interstate freeway." R. IV, 8–9. But as the dissent notes, the officer testified that the highway traffic was extremely light that night.

**4.** In *Hayes,* the Court ignored *United States v. Hensley*'s balancing test in favor of prior precedents: "None of our later cases have undercut the holding in *Davis* that transportation to and investigative detention at the station house without probable cause or judicial authorization together violate the Fourth Amendment." —— U.S. at ——, 105 S.Ct. at 1646. The Court specifically stated that *Hensley* and *Sharpe* do not conflict with this principle. *See id.* The only

exception to this rule that the Court foresaw was the possible existence of exigent circumstances. *See Hayes,* —— U.S. at —— n. 3, 105 S.Ct. at 1647 n. 3.

**5.** "Exigent circumstances" generally refers to a quite different level of circumstances: imminent danger of death or serious bodily harm, imminent danger of destruction of important property, response to an emergency, or hot pursuit of a fleeing felon. *See United States v. Dart,* 747 F.2d 263, 267 (4th Cir.1984); *United States v. Tabor,* 722 F.2d 596, 598 (10th Cir.1983); 2 W. LaFave, *Search & Seizure* § 6.5 (1978 & Supp. 1985).

Although the stop was at night and the officer testified that he required the trip to the state

Although the cases eschew any attempt to formulate a bright line rule in this area, *Hayes* nevertheless declared that "the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from ... [a] place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes." — U.S. at ——, 105 S.Ct. at 1646. Thus, we understand the *Hayes* decision as eliminating the option of forcing the suspect to go to the police station from the alternatives available to the officer during an investigative detention. Even if *Hayes* intended no precise line drawing, we believe it at least required consideration of the other alternatives available to the officer at the time of the stop. This officer had reasonable alternatives to the coerced trip to the police station. He could have called for a backup officer; he could have obtained on the spot a voluntary consent to search and a consent to have the suspects drive their car to a safer location on the highway. These and other readily imaginable alternatives would neutralize the adverse factors of darkness, traffic, and being outnumbered.

■ We recognize that if there is sufficient attenuation between an illegal detention and a consent to search, the search may be valid despite the prior illegal acts of the officer. *See United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985). Here neither the government nor the court attempted to establish attenuation. At the time the consent to search form was handed to defendant the officer still had not informed him that he was free to leave, and the officer held defendant's car registration and apparently the title to the vehicle. Under these circumstances we believe the government cannot establish sufficient separation between its illegal coercive acts and the consent to search to take the product of the search, the cocaine, out of the category of fruit of the unlawful detention. *See id.* at

police office for "their safety and protection" from oncoming traffic, we believe that neither the officer nor the trial court made any attempt

—— – ——; *Hayes,* —— U.S. at ——, 105 S.Ct. at 1645.

Therefore, we reverse the district court's refusal to suppress the cocaine found in the search of the car that defendant was driving.

REVERSED AND REMANDED.

HOLLOWAY, Chief Judge, dissenting.

I respectfully dissent. I am unable to agree with the majority opinion that *Hayes v. Florida,* —— U.S. ——, 105 S.Ct. 1643, 84 L.Ed.2d 705 (1985), established any general rule "eliminating the option of forcing the suspect to go to the police station from the alternatives available to the officer during an investigative detention." Maj. op. at 1133. I am convinced that to determine the lawfulness of conduct connected with such a detention, all the surrounding circumstances must be considered, *see, e.g., United States v. Sharpe,* —— U.S. ——, ——, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), and that here they were such that the constitutional guarantee of the Fourth Amendment against unreasonable searches and seizures was not violated.

The majority agrees with the district court that the length of the stop was reasonable, stating that "[a]lthough the police officer equivocated about the time elapsed from the initial stop to the incriminating search, it clearly lasted only a short while." Maj. op. at 1131. While Gonzalez argues that the time of the detention was not brief but excessive, Memorandum Brief of Appellant 21, 23, I agree with the majority on this point. *See United States v. Sharpe,* —— U.S. ——, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Thus only the movement from the roadside to the station and events there divide us. For reasons that follow, I am convinced that this incremental intrusion did not amount to an unconstitutional seizure in the circumstances of this case.

to justify the action on an exigent circumstances basis.

I

Officer Toler, working alone, stopped a westbound automobile for speeding on a cold January night about 9:00 p.m. on Interstate 40. The stop occurred about 3½ to 4 miles east of Moriarty, New Mexico. III R. 18–19, 26, 43. Defendant was the driver and there was also a woman passenger in the car. The trial court found that the officer's action is stopping the car for speeding was completely proper.

The court found that the officer inquired about the driver's license and the car title and found that Gonzalez had a New York driver's license, while the car had California license plates; the car was registered in California in the name of someone other than Gonzalez and there was a California title in the car, in blank, unsigned. IV R. 4. During the time they were at the highway location, the officer stopped another car, and gave a verbal warning. *Id.* at 51, 54. Gonzalez was vague in his responses about the owner of the car and could not tell the officer how to get in touch with the owner and the destination of Gonzalez was not completely clear; he was going to a Holiday Inn in Albuquerque to deliver the car. The court found the officer was "thoroughly justified in detaining Defendant and looking into the possibility of a stolen car." *Id.* at 4.

The court found that the officer asked defendant to follow him back to Moriarty, which Gonzalez agreed to do.[1] However, it was found that since the officer had the driver's license and car title, he "really had no choice" but to go with the officer. *Id.* at 5. The court found the officer was authorized to keep Gonzalez detained long enough to go back to Moriarty to look into the matter further, even though the NCIC check made on the way was negative.

"That does not end the matter. An officer is entitled to look into it further where you have this third party registration in a different state." IV R. 5–6.

In addition, the trial judge found that "the officer had reasons to suspect that there were narcotics in the car and to have a reason to want to search the car," and that the experience in the highway patrol is that deodorizers are often used to mask the scent of narcotics. Further the judge found that it was reasonable under those circumstances to ask the defendant to drive to Moriarty. The time involved was a very few minutes, and particularly "since this was at night and there could be problems on the side of a very busy interstate freeway, conducting a vehicle search, complete vehicle search at night. So I think it was reasonable, under the circumstances." IV R. 6–7, 8–9.[2]

In addition, I note that there was the woman passenger and thus a threat of danger from two persons to the single officer in trying to check on the car and then attempting a thorough vehicle search on the dark highway, if Gonzalez permitted this. This concern in no way assumes there was probable cause for a warrantless arrest and search, but is based on the circumstances facing the officer if he attempted to complete his investigation and a search for which he wanted to seek consent. And further I note that the officer testified that at the station it was so cold standing outside, and Gonzalez was shivering and had no heavy coat, that the officer asked him to step inside. The citation was issued, and the officer then got the consent-to-search form. After the citation was issued, the officer testified he did not tell Gonzalez he could go before the consent form was discussed. *Id.* at 42. Gonzalez

---

1. This finding indicates that Gonzalez had to turn around and change his route to go to the station in Moriarty. The evidence is undisputed, however, that Gonzalez was westbound and was stopped east of the town. Thus the intrusion was lessened because he continued his direction of travel in going to Moriarty with the officer.

2. The court's finding referred to the busy interstate freeway. In that regard, the officer did testify the traffic was extremely light that night. III R. 54. However, the danger of the situation—whether there was heavy traffic or the officer and the suspects were alone—is still serious for the officer in my judgment and involved substantial risks for him in dealing with persons suspected of illegal activity.

said he understood English; he read the consent form, said he understood it, and signed the form. III R. 26–28. While these events occurred, the woman passenger was sitting in the front of the office, and the only other person there in addition to Gonzalez, the woman, and officer Toler was the dispatcher. *Id.* at 29, 66.

The trial court found that Gonzalez read and understood the consent form and voluntarily and freely executed it. IV R. 7. While I agree with the majority that the signing of the form was not sufficiently separated from the detention to remove the taint if an unlawful arrest occurred, in these circumstances I would uphold the denial of suppression. I would hold that the officer's conduct was lawful as a *Terry* investigatory detention, after balancing the personal interests of Gonzalez against the governmental interests involved.

## II

In *Terry,* "the Court recognized the narrow authority of police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause." *Michigan v. Summers,* 452 U.S. 692, 698, 101 S.Ct. 2587, 2592, 69 L.Ed.2d 340 (1981). However, the *Terry* exception for limited intrusions "is not confined to the momentary, on-the-street detention accompanied by a frisk for weapons involved in *Terry.*" *Id.* at 700, 101 S.Ct. at 2593. "For 'what the Constitution forbids is not all searches and seizures but unreasonable searches and seizures.' *Elkins v. United States,* 364 U.S. 206, 222 [80 S.Ct. 1437, 1446, 4 L.Ed.2d 1669] (1960)." *Terry,* 392 U.S. at 9, 88 S.Ct. at 1873.

Under *Terry* and its progeny "*some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable*

cause, so long as police have an articulable basis for suspecting criminal activity." *Michigan v. Summers,* 452 U.S. at 699, 101 S.Ct. at 2592 (emphasis added). To determine whether a search or seizure based on less than probable cause is reasonable under the Fourth Amendment, a court must balance a limited violation of individual privacy against the opposing interests in crime prevention and detection and in the police officer's safety. *See Dunaway v. New York,* 442 U.S. 200, 209, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); *see also Michigan v. Long,* 463 U.S. 1032, ——, 103 S.Ct. 3469, 3477, 77 L.Ed.2d 1201 (1983). Here the trial judge clearly had this proper test in mind when he made his findings and conclusions denying suppression. Those findings are supported by the record and they rest on sound principles balancing the personal rights involved and the governmental interests in law enforcement and the safety of the officer—principles not scuttled by *Hayes* or other decisions.

As stated, my disagreement with the majority opinion begins with its apparent conclusion that in all circumstances *Hayes* eliminated the option of bringing the suspect to the station house during an investigative detention. *See* maj. op. at 1133. The majority opinion recognizes that the "cases eschew any attempt to formulate a bright line rule in this area," but nevertheless concludes that *Hayes* "eliminat[ed] the option of forcing the suspect to go to the police station from the alternatives available to the officer during an investigative detention." Maj. op. at 1133. The majority appears to read *Hayes* as rejecting *all* moves to the station house. I must disagree with such a broad interpretation of *Hayes* for three reasons.

First, the majority ignores important factual distinctions between *Hayes* and the instant case. The suspect in *Hayes* was taken from his home, not the side of a highway.[3] In *Hayes* the suspect told the

---

**3.** I am cognizant of *United States v. Recalde,* 761 F.2d 1448 (10th Cir.1985). There an officer stopped a car for speeding just outside of Moriar-ity, New Mexico during a rainstorm. The stop occurred just after noon, and the suspect was alone in his car. During the stop, circumstances

officers that he did not want to accompany them from his home to the station house, but when the police officers said that they would arrest him if he did not go, Hayes "blurted out" that he would prefer to go rather than be arrested. — U.S. —, —, 105 S.Ct. 1643, 1645, 84 L.Ed.2d 705.[4] That Hayes' removal from his home was important to the court's decision is evident from the Court's statement that none of its cases have upheld the "involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes." — U.S. at —, 105 S.Ct. at 1645.[5]

Second, *Hayes* itself recognized that there might be instances when suspects may be moved to the police station during investigative detentions. *Hayes* stated that there was no suggestion that there

were any "exigent circumstances making necessary the removal of Hayes to the station house for the purpose of fingerprinting." — U.S. at — n. 3, 105 S.Ct. at 1647 n. 3. This implies, as the majority here recognizes at one point, that some moves to the station house may be justified by exigent circumstances. *See* maj. op. at 1132 n. 4.

Third, the proper balancing test requires that the reasonableness of an investigative detention be judged by all the surrounding facts and circumstances. *United States v. Sharpe*, — U.S. —, —, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), which was decided the same day as *Hayes*, stated that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must

---

developed making the officer suspicious that the car was stolen and carrying narcotics. The officer radioed for the assistance of another officer. After the other officer's arrival, the suspect and the officers "then proceeded back five miles to [the police station in] Moriarity, with [the suspect's] car sandwiched between [two] police cruisers." Maj. op. at 1452. The officers took the suspect into a small room in the station house, gave him *Miranda* warnings, questioned him, and obtained the suspect's consent to search his car.

Cocaine was found in the search of the car, and the trial court refused to order suppression. This court relied on *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), and *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1981) (plurality opinion), *inter alia*, and reversed, concluding that the "police conduct in this case cannot be characterized as minimally intrusive. This sort of police activity is an abuse of investigative detention and violates the Fourth Amendment." Maj. op. at 1456.

The court then further said that its "conclusion is confirmed by the Supreme Court's decision in *Hayes*," and that *Hayes* rejected the claim that a *Terry* detention "could be the basis for justifying an arrest or for taking a suspect into police custody at a station house." Maj. op. at 1456. I disagree with this broad observation about *Hayes* in the *Recalde* opinion, which was unnecessary to that decision, and with the similarly broad rule that the majority tries to hammer out of *Hayes* here. My reasons for rejecting such an unjustified interpretation of *Hayes* are detailed in the text.

In my view, *Recalde* is plainly distinguishable on its facts from the case at bar. Unlike the instant case, the officers in *Recalde* were not

faced with a situation of such danger as officer Toler faced here. Moreover the trial court in *Recalde* made no findings regarding the danger to the officers. There was only one person in the vehicle, there were two officers, and the stop was during the daytime. Furthermore, the intrusion to the suspect was much greater in *Recalde* than in the case at bar. In *Recalde* the suspect drove "back" to the police station "sandwiched" between two police cars; he was given *Miranda* warnings, and he then was questioned while confined in a small room inside the station. *See Sharpe*, — U.S. at —, 105 S.Ct. at 1573 (primary focus in *Royer* was on facts other than length of detention, particularly the fact that police *confined* defendant in a small airport room for questioning).

4. In holding that this police action was impermissible under the *Terry* line of cases, *Hayes* followed *Davis v. Mississippi*, 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969), a similar case where the 14 year old suspect was "brought in" for fingerprinting.

5. One of the cases that *Hayes* relied on was *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). *Hayes* stated "that the pertinent facts in *Dunaway*, where we invalidated the detention, were 'that (1) the defendant was *taken from a private dwelling;* (2) he was transported unwillingly to the police station; and (3) he there was subjected to custodial interrogation resulting in a confession.'" — U.S. at — – — n. 2, 105 S.Ct. at 1647–48 n. 2 (quoting *United States v. Sharpe*, — U.S. — n. 4, 105 S.Ct. at 1574 n. 4) (emphasis added).

govern over rigid criteria." *See also Florida v. Royer,* 460 U.S. 491, 500, 506–07, 103 S.Ct. 1319, 1326, 1329, 75 L.Ed.2d 229 (1983) (plurality opinion) (scope of intrusion permitted will vary to some extent with the particular facts and circumstances of each case; no litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop); *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201 (1983) (In evaluating validity of officer's investigative or protective conduct under *Terry,* the touchstone is always the reasonableness in all the circumstances of the particular governmental intrusion of a citizen's personal security.); *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) (investigative stop of a vehicle must be justified by some objective manifestation that that person is or is about to be engaged in criminal activity, and the essence of all that has been written about what cause is sufficient is that "the totality of the circumstances—the whole picture—must be taken into account"); *see also United States v. Pelusio,* 725 F.2d 161, 165 (2d Cir.1983) (reviewing court must consider totality of circumstances, and permissible duration and intrusiveness of an investigative stop depend on extent of law enforcement interest and seriousness of conduct giving rise to a reasonable suspicion of unlawful activity).

*Hayes* nowhere rejected the rule in the Court's cases since *Terry* that in evaluating the validity of an officer's investigative or protective conduct under *Terry,* the " '[t]ouchstone of our analysis … is always the 'reasonableness in all circumstances of the particular governmental intrusion of a citizen's personal security.' " *Pennsylvania v. Mimms, supra,* 434 U.S., at 108–09 [98 S.Ct. at 332] (quoting *Terry, supra,* 392 U.S., at 19 [88 S.Ct. at 1878])." *Michigan v. Long,* 463 U.S. at 1051, 103 S.Ct. at 3481 (Ellipsis added by *Long*). *Hayes* is thus clearly a different case than that which confronted the officer here. On a cold January night, on the side of the highway, the single officer faced two persons suspected of dangerous illegal activity. And he was faced with the peril of trying to carry out a full search of the car there, if consent were given.[6]

Thus, *Hayes* laid down no general rule barring any movement of suspects to a station house from a highway location during a *Terry* investigative detention. The rule is still one of balancing the private and governmental interests involved.

Changing the place of an investigatory detention is not per se a Fourth Amendment violation. The plurality in *Florida v. Royer,* 460 U.S. 491, 504–05, 103 S.Ct. 1319, 1328, 75 L.Ed.2d 229 (1983), noted that "there are undoubtedly reasons of safety

---

**6.** I must firmly disagree with the conclusion of the majority that no attempt was made in the instant case to justify the action of the officer on an exigent circumstances basis. Slip. op. at 12 n. 5. The facts and circumstances were developed in the record sufficiently for the trial judge to draw his conclusions that:

Experience in the highway patrol is that, often, deodorizers are used to mask the scents of narcotics, smell or scent of narcotics in a car, so that fact, along with the others as to the third-party ownership and the California driver's license or New York, the officer is entitled to have reasonable grounds to want to search the car for narcotics.

It was reasonable, under those circumstances, to ask the Defendant to—to detain him long enough to do that and to ask him to drive to Moriarty for the purpose of accomplishing that elsewhere than on the side of the highway at night. Therefore, it was a legit-

imate detention on both grounds: the suspicion of a problem with the status of the car, whether it might be stolen, and the suspicion that there might be narcotics inside the car.

. . . .

One further thing. I'm not sure that I mentioned it; I meant to. But in connection with the detention, the return to Moriarty, I do note it was only three miles away; therefore, the length of time involved was just a very few minutes additional, whether the search had been attempted on the highway or in Moriarty, and I think the time is certainly reasonable, very particularly since this was at night and there could be problems on the side of a very busy interstate freeway, conducting a vehicle search, complete vehicle search at night. So I think the time is reasonable, under the circumstances.

IV R. 6–7, 8–9.

and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area." Limited movement of suspects during investigatory detention has been upheld. *See, e.g., United States v. Vanichromanee,* 742 F.2d 340, 344–45 (7th Cir.1984) (movement from parking garage to apartment; "[t]hat the three [suspects] were moved from one spot of temporary detention to another did not vitiate the investigatory nature of the stop," citing *Royer*); *United States v. Oates,* 560 F.2d 45, 57 (2d Cir.1977). "The exigencies of the circumstances determine what moves [in a *Terry* stop] are reasonable in a given situation." *United States v. White,* 648 F.2d 29, 37 (D.C.Cir.), *cert. denied,* 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233 (1981). The question is whether the degree of intrusiveness is "reasonable and thus permissible under the Fourth Amendment." *Pennsylvania v. Mimms,* 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331 (1977) (per curiam). In *Mimms* the Court said that where the initial detention of the car was lawful, the inquiry must "focus not on the intrusion resulting from the request to stop the vehicle or from the later 'pat down,' but on the *incremental intrusion* resulting from the request to get out of the car once the vehicle was lawfully stopped." *Id.* (emphasis added).·

Balancing the governmental interests involved against the "incremental intrusion" of following the officer to the station and inside for the discussion there, I must conclude that the officer's conduct was justified. First, a prime governmental interest here is the protection of the lone officer at night from the serious danger that the two suspects posed in or around their car. As the Court stated in *Michigan v. Long,* 463 U.S. 1047, 103 S.Ct. at 3479, "investigative detentions involving suspects in vehicles are especially fraught with danger to police officers." *See also id.* at n. 13. " 'Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties.' " *Penn-*

*sylvania v. Mimms,* 434 U.S. at 110, 98 S.Ct. at 333 (quoting *Terry,* 392 U.S. at 23, 88 S.Ct. at 1881).

Second, the trial judge noted the danger of accidental injury to the officer at night on the side of the interstate highway in attempting an investigatory stop and search. This concern was recognized in *Pennsylvania v. Mimms,* 434 U.S. at 111, 98 S.Ct. at 333 (the officer has an interest in avoiding the "hazard of accidental injury from passing traffic").

Third, the governmental interest in detection of illegal drug trafficking is compelling. *See United States v. Place,* 462 U.S. 696, 703 & n. 5, 103 S.Ct. 2637, 2643 & n. 5, 77 L.Ed.2d 110 (1983). As Justice Powell has stated:

> The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit.... Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs, including heroin, may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement.

*United States v. Mendenhall,* 446 U.S. 544, 561–62, 100 S.Ct. 1870, 1880–81, 64 L.Ed.2d 497 (1980) (Powell, J., joined by Burger, C.J., & Blackmun, J., concurring in part and concurring in judgment).

In my judgment, these governmental interests outweigh the incremental intrusion on Gonzalez. That intrusion was not excessive. The length of the detention throughout was reasonable, as both the majority and I conclude. The intrusion first involved following the officer some 3½ to 4 miles to the police station in Moriarty, which was in the same direction Gonzalez had been traveling. Unlike the defendant in *Hayes,* Gonzalez drove to the police station in his own car, and he was not taken from his home. Once there, the intrusion included going into the station, instead of remaining outside shivering in the cold January night, while the officer issued the

citation, obtained Gonzalez' written consent for the search, and then searched the car.[7]

On balancing these interests, I am persuaded that there was no violation of the constitutional guarantee against unreasonable searches and seizures and would affirm.

---

7. The majority believes that even if *Hayes* did not intend to draw a precise line, the Court "at least required consideration of the other alternatives available to the officer at the time of the stop." Maj. op. at 1133. The majority suggests that the officer "could have called for a backup officer; he could have obtained on the spot a voluntary consent to search and a consent to have the suspects drive their car to a safer location on the highway." *Id.* at 1133. According to the majority, "[t]hese and other readily imaginable alternatives would neutralize the adverse factors of darkness, traffic, and being outnumbered." *Id.*

I cannot agree with the majority's view that *Hayes* requires consideration of alternatives. Such a reading of *Hayes* is contrary to *Sharpe*, decided the same day. In *Sharpe* the court stated:

A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, in itself, render the search unreasonable." *Cady v. Dombrowski,* 413 U.S. 433, 447, 93 S.Ct. 2523, 2531, 37 L.Ed.2d 706 (1973); see also *United States v. Martinez-Fuerte,* 428 U.S. 543, 557, n. 12, 96 S.Ct. 3074, 3082, n. 12, 49 L.Ed.2d 1116 (1976). The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

*Sharpe,* —— U.S. at ——, 105 S.Ct. at 1575 (emphasis in original).