REMINGTON ARMS COMPANY, INC. (PETERS CARTRIDGE DIVISION), Appellant,

v.

William W. WILKINS, III, a Minor, Etc., Appellee.

No. 24528.

United States Court of Appeals Fifth Circuit.

Dec. 13, 1967.

Rehearing Denied Feb. 9, 1968.

W. H. Sadler, Jr., and W. J. Sullivan, Jr., Birmingham, Ala., for Remington Arms Company, Inc. (Peters Cartridge Division), Sadler, Sadler, Sullivan & Sharp, Birmingham, Ala., of counsel.

William B. Fernambucq, Charles A. Stewart, Jr., Birmingham, Ala., William W. Wilkins, III, Huie, Fernambucq & Stewart, Birmingham, Ala., of counsel.

Before COLEMAN and GOLDBERG, Circuit Judges, and HANNAY, District Judge.

COLEMAN, Circuit Judge:

The plaintiff-appellee sued the Remington Arms Company for personal injuries, including the loss of an eye, when a cartridge manufactured by the company failed to fire and subsequently exploded upon ejection from a rifle. There was a jury verdict for the plaintiff in the sum of $68,333 and judgment accordingly. We affirm.

The case went to the jury on the sole issue of manufacturer's liability under Alabama law. The issue may best be stated by copying from the agreement of the parties at the pre-trial hearing:

"As against Remington, contending that it was guilty of negligence in the manufacture or design of such cartridge, plaintiff insists that it knew of its dangerous potential, knew or rea- sonably should have known that the user would not realize the danger, and failed to use reasonable care to safeguard against the danger or to inform the user of the facts which made it likely to be dangerous."

Appellant relies for reversal on the rule that a manufacturer is under no duty to warn of the possibility of injury to a user of a product where the type accident which occurred cannot be reasonably foreseen and further relies upon the additional principle that testimony which is contrary to the laws of science and contrary to common sense is of no evidentiary value and thus cannot raise an issue for jury determination, citing Rota v. Combs, 267 Ala. 50, 99 So.2d 692; King v. Brindley, 255 Ala. 425, 51 So.2d 870. Quoting the appellant, "The heart and soul of this appeal lies in the aplant's contention that there was insufficient proof of negligence on its part to submit the case to the jury".

■ This being a diversity suit we must apply to these contentions the test of whether there is a rational basis in the record for the jury's verdict, Planters Manufacturing Company v. Protection Mutual Insurance Company, 5 Cir., 1967, 380 F.2d 869, cert. denied 389 U.S. 930, 88 S.Ct. 293, 19 L.Ed.2d 282 [November 7, 1967]; Liberty Mutual Insurance Company and Monsanto Chemical Company v. Falgout, 5 Cir., 1967, 386 F.2d 248 [November 17, 1967].

The Alabama law on manufacturer's liability is clear.

One of the earlier cases was Altorfer Bros. Co. v. Green, 236 Ala. 427, 183 So. 415 (1938). Mrs. Green brought suit against the manufacturer of a washing machine for injuries sustained when her hand was caught in a wringer. The Alabama Supreme Court approved the rule, "If it [the manufactured product] is known by defendant to be imminently or inherently dangerous when used in the customary manner, due care must be tak-

en to acquaint the public of such danger, though it is not defective".

The next year, the Alabama Supreme Court decided Miles v. Chrysler Corporation, 238 Ala. 359, 191 So. 245, in which it stated,

"It is to be deduced from the cases of Sterchi Bros. Stores v. Castleberry, 236 Ala. 349, 182 So. 474 and Altorfer Bros. Co. v. Green [supra] that the rule announced was that a manufacturer who, without giving notice of its character or quality, supplies or delivers to another a machine or article which at the time of delivery he knows to be imminently dangerous to the life or limb of anyone who may use it for the purpose for which it is intended, is liable to any one who sustains injury from its dangerous condition whether he has any contractual relation with him or not".

Further elaboration is found in Defore v. Bourjois, Inc., 268 Ala. 228, 105 So.2d 846 (1958):

"The complaint, as finally amended, was framed, and the cause was tried, on the manufacturers liability doctrine. This doctrine applies in those limited cases where there is no privity of contract between the ultimate user and the manufacturer and where the manufacturer has negligently placed on the market a product which is inherently or imminently dangerous to human life or health, or which, although not dangerous in itself, becomes so when applied to its intended use in the usual and customary manner. Where the user thus sustains an injury which is the natural and proximate result of this negligence in the manufacture *or sale* (emphasis added) of the article and if the injury might have been reasonably anticipated, then the manufacturer is liable to the user under the manufacturers liability doctrine. 65 C.J.S. Negligence § 100(b); Miles v. Chrysler Corporation, 238 Ala. 359, 191 So. 245; Altorfer Bros. Co. v. Green, 236 Ala. 427, 183 So. 415; Sterchi Bros. Stores v. Castleberry,

236 Ala. 349, 182 So. 474; Crane Co. v. Davies, 242 Ala. 570, 8 So.2d 196; Jefferson Standard Life Ins. Co. v. Watson, 242 Ala. 181, 5 So.2d 639; Jones v. Gulf States Steel Co., 205 Ala. 291, 88 So. 21, citing and discussing MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas.1916C, 440; Birmingham Chero-Cola Bottling Co. v. Clark, 205 Ala. 678, 89 So. 64, 17 A.L.R. 667 and 672."

The Court stated in the course of the opinion that gunpowder [naming others] is an inherently dangerous article.

The latest case to come to our attention is Norton Company v. Harrelson, 278 Ala. 85, 176 So.2d 18 (1965). After reaffirming the principles above discussed, the Alabama Supreme Court said:

"Contrary to appellant's contention, the doctrine of manufacturer's liability does not require proof of a specific defect in the article itself [citing Trowbridge v. Abrasive Co. of Philadelphia, 3 Cir., 190 F.2d 825]."

This being the Alabama law, we now consider the facts of the case, giving the appellee, on disputed issues, the benefit of the jury verdict.

On December 28, 1964, appellee, twenty years of age, was at home in Birmingham on leave from the Navy. He testified as follows:

At a department store he purchased two boxes of .22 Remington long rifle cartridges. The containers carried no warning as to precautions to be exercised in case of mis-fire or hang fire. Thereafter, using a Mossberg semi-automatic rifle, which he had fired on prior occasions, Mr. Wilkins shot about nineteen rounds into a dirt bank, without mishap. He pulled the trigger again, heard it snap, but the rifle did not fire. He brought it down from his shoulder and started opening the breach. At a point when he had succeeded in pulling the bolt back about 7/16 of an inch, which allowed him to see in the bolt and see the cartridge, there was a flash of light. He

testified, "I could see the cartridge before it went off. I saw it as it went off".[1] By later re-enactment of the episode it was demonstrated that approximately five seconds elapsed between the snap and the flash. He categorically denied that the bolt slipped from his hand and caused the cartridge to fire [slip fire].

A fragment of the exploding cartridge pierced Wilkins' left eye. He was hospitalized for nineteen months during which time the eye was surgically removed.

His father testified that he had purchased the rifle new, that it was between fifteen and twenty years old. He further testified that prior to the time of this accident, December 28, 1964, the rifle had never misfired while he was using it, and that he had never had any mechanical difficulty with it. On the day of the accident, after returning from the hospital where his son was being treated, Mr. Wilkins found the rifle where it had been tossed after the explosion. He picked the gun up and started to open it. There was a piece of brass in the shaft, with a "gapping" hole in it, which turned out to be the exploded cartridge, with the bullet gone. The bullet was never found. This witness further testified that the rifle had not been used or oiled for a period of six or eight months before the accident.

Edward S. Watts, III, was called as an expert witness for the plaintiff.

He had spent four years in the Air Force as a weapons mechanic. About three years previously, after 2760 hours of actual instruction, he had graduated from the Colorado Trade School as a gunsmith. He had worked as a gunsmith in Birmingham during hunting season and pursued other occupations in between. His business in Birmingham had been restricted to rim fire rifles and shotguns. He stated that .22's constitute ninety per cent of all rim fire weapons. In a rim fire, the primer is in the rim and the firing pin strikes the rim and ignites the primer which detonates the weapon. In a Mossberg rifle the firing pin strikes at the top of the rim. About two months prior to the trial this gunsmith "broke down" and inspected the Mossberg rifle used by young Wilkins on December 28, 1964. He also examined the exploded cartridge hull. He found the gun to be in "very good condition". He found the exploded cartridge "had been struck a very good blow by the firing pin. The cartridge had been ruptured". He was of the opinion, from examination of the rifle and the cartridge, that at the time the firing pin struck the rim the bolt was fully closed. Additionally, he was of the view that at the time the cartridge exploded it was only partly chambered. As a matter of expert opinion, this testimony tended to corroborate plaintiff's eyewitness testimony as to what actually happened. Mr.

1. A. I had fired several times, I had the rifle up. I pulled the trigger and it didn't go off. I just brought it down and started opening the breach.
   Q. What happened?
   A. It went off.
   Q. You have demonstrated you pulled the trigger and it snapped. Did it make that kind of a noise?
   A. Yes, sir.
   Q. Then was when you dropped it down?
   A. Yes sir.
   Q. What did happen?
   A. As I started pulling the bolt back, there was a flash of light. I jerked my head back and sort of threw the gun away from me this way (indicating). As I opened up my eyes again, All I could

see was red out of this eye (indicating). After that, I saw nothing out of this eye (indicating).
   Q. You are pointing to your left eye?
   A. Yes, sir.
   Q. This flash, as it was flashing there, do you have until today or not a mental picture or image, so-called, of what you saw or what you were looking at?
   A. I have a pretty vivid picture of what happened.
   Q. I will ask you, you had pulled the bolt back some?
   A. Yes, sir.
   Q. Had it come back to where you could see into the bolt? Was there an opening there?
   A. I could see the cartridge before it went off. I saw it as it went off.

Watts had no training or knowledge in the manufacture of ammunition.

The plaintiff-appellee being alone at the time of the accident it was, of course, impossible to contradict his version by eyewitness testimony. Consequently, Remington staked its defense on the testimony of three highly qualified expert witnesses, who gave their opinions of what really happened. In the opinion of the first expert, there was an original mis-fire following which Wilkins pulled the bolt back and then let it slip from his fingers, allowing the bolt to fly forward and fire the cartridge. We again note that this opinion is contradicted by the direct evidence of Wilkins, who emphatically denied allowing the bolt to slip through his fingers.

This witness was of the further opinion that the shell involved developed normal compression and had priming mixture in it. The normal time from the priming mixture being struck until the bullet leaves the barrel is between two and three one-thousandths of a second, and the rate of activation of the primer mixture is measured in hundred-thousandths of a second which is very much quicker than a person could snap his fingers. With respect to .22 rim fire cartridges the witness had never experienced a delay of five seconds between the time the shell is struck and the time it fires, and in his research he had never heard of such a happening. In January, 1966, he test fired the gun which the plaintiff was using at the time of the accident and in firing two magazines of ammunition had fifteen malfunctions which were the result of light strikes or the cartridge not being ejected or being fed properly. He then examined the gun and found the bolt and receiver were covered with black carbon particles. This, however, could be explained by the fact that after the accident the rifle had been left in the coal burning heater room of the Wilkins home. *He stated that he had heard of a rule that, when a mis-fire is experienced, one should count to ten before ejecting the shell and that it is a good rule but that insofar as having a hang-fire one could open the bolt instantly.* The witness further stated that if a shell contained some powder, but less than the specified amount, the velocity of the bullet out of the barrel would be lower but there would still be a instant or split-second firing of the shell.[2]

2. Typical testimony of these expert witnesses may be shown from the following excerpts:

*Expert Witness No. 1*

Q. In the course of your experience over the years, I will ask you if you yourself firing shells of this type, .22 rim-fire cartridges, you yourself have ever experienced a shell that has been struck and that shell does not fire for five seconds after the time it has been struck?

A. No.

Q. In your research and in your experience, have you ever heard of that happening?

A. With modern ammunition and modern priming mixture, never.

Q. In your opinion, what is the lapse between the time that this shell is struck, the rim of this shell is struck with sufficient force to activate the primer mix, powder and the bullet leaves the shell?

A. The normal time from striking the primer until the bullet leaves the barrel muzzle is around two to three one-thou- sandths of a second. Two to three milli-seconds.

Q. Are you familiar, Colonel, with the rate of activation of the primer itself in a shell of this type?

A. Yes.

Q. Approximately what is that rate?

A. That would be measured in hun- dred-thousandths of a second. Almost instantly.

Q. Quicker than I could snap my fingers?

A. Very much more.

Q. Colonel, with reference to the prim- er mix or mixture used in these shells, if there is sufficient primer mix for the shell to fire, if it is properly struck, it fires, and if it isn't properly struck, it doesn't fire, is that correct?

A. Yes, sir, that is correct.

*Expert Witness No. 2*

Q. I will ask you, Mr. Stier, based on your experience in your work with the Company, whether or not a shell that has sufficient priming mixture in the head of the shell, to cause the shell to burst, that if that shell is struck a proper blow

The next expert witness for Remington, one of its employees, was familiar with the priming mixture used in .22 rim fire cartridges and its rate of firing. From the time the rim of the shell is struck until the priming mixture is activated is less than ten-millionths of a second. The rate of activation does not depend on the quantity of the mixture; if there is sufficient mixture to detonate the shell, the rate of activation would not vary. He further testified that the normal firing rate for the type shell involved in this litigation is 4 to 5 milliseconds and the longest time obtained under extreme laboratory conditions of using a minimum of priming mixture and cooling the cartridge to minus ninety degrees was twenty milli-seconds. This same twenty milli-seconds would apply to a shell in which the priming mixture activates and develops only enough pressure for the bullet to get out of the barrel of the gun. He stated if a shell had sufficient priming mixture to cause a shell to burst, a delay in the burst of the shell of three seconds would be physically impossible and with respect to .22 rim fire shells he had never heard of such a happening.

The third expert witness has worked for the defendant since 1941, first in the testing of raw materials and since 1961 in the Ballistics Department where he is in charge of testing the finished products of the company including .22 rim fire cartridges. 5,000 rounds of this type shell are fired each production day and during the five years he has been in charge of this department he has never seen, experienced or had called to his attention a firing delay of this type cartridge of as long as one second. He fired the rifle which the plaintiff was using at the time of the accident and in the first fifty rounds experienced one misfire and two instances of the gun firing twice with one pull of the trigger. The gun was broken down and found to be dry and contained a residue from firing shells. He later conducted slip fire tests and while using high velocity shells, such as the plaintiff was using at the time of the accident, obtained bursts and bulges similar to that shown on the shell involved in the accident. He did not get these bursts or bulges when using standard velocity shells such as plaintiff's expert used in his tests. The witness further testified that shells are tested for different characteristics; that there are approximately 60 people in the Ballistics Department; *that there is a Department rule not to open a gun for thirty seconds when a misfire occurs and that this is an industry recognized rule in ballistic tests and that the company requires safety glasses be worn in all production areas.*

by the firing pin of the gun, it would be possible that there would be a delay in the burst of that shell for as long as three seconds?

A. In my opinion, this is physically impossible.

Q. In your experience have you ever heard of that?

A. I have never heard of it.

Q. I will ask you, Mr. Stier, if you have made any determination in the course of your work with the Company as to the rate in which this priming mixture would become activated after having been struck by a firing pin of a rifle?

A. Yes, sir.

Q. Would you tell me just what that rate in normal primer is?

A. Less than ten-millionths of a second.

*Expert Witness No. 3*

Q. Mr. Vaughn, I will ask you to tell the ladies and gentlemen of the jury whether or not from the period of time you have been in the Ballistics Department, 1961, to now, to date, in your experience, or whether there has come to your attention in the course of that test firing, an incident, a single incident where there has been a delay from the time the firing pin has struck the rim fire shell and until the time that shell actually exploded of as much as two seconds?

A. I have never seen or experienced or had it called to my attention, such a hang fire as described.

Q. Or as much as one second?

A. No, sir.

**54**

In view of the verdict it is elemental that the appellee is entitled to have the evidence considered in that light most favorable to him, including the benefit of every inference that reasonably may be drawn therefrom.

Applying the Alabama law as to manufacturer's liability, hereinabove set out, we must now decide the crucial question—Does the jury verdict find rational support in the record? We are of the opinion that it does, hence the Judgment must be affirmed.

Obviously, the jury believed the eyewitness testimony of the injured plaintiff as to how the cartridge exploded, five seconds after the trigger was pulled. It must have accepted the testimony of plaintiff's expert that the firing pin struck the rim a normal blow, at a time when the cartridge was fully chambered, which, had the cartridge not been defective for some cause, should have fired it in a split second.

The only testimony to the contrary is that of the defense experts that such an occurrence is scientifically impossible. More than eight years ago, Seaboard Surety Company v. First National Bank of Montgomery, 5 Cir., 1959, 263 F.2d 868, 871, it was held that jurors are not bound to accept the uncontradicted opinions of expert witnesses but have a right to use their own common sense and experience and to draw all reasonable inferences from the physical facts and occurrences. See also, Mound Company v. Texas Company, 5 Cir., 1962, 298 F.2d 905; New York Life Insurance Co. v. Johnston, 5 Cir., 1958, 256 F.2d 115; Rewis v. United States, 5 Cir., 1966, 369 F.2d 595.

Quite recently, October 13, 1966, Jones v. N. V. Nederlandsch-Amerikaansche Stoomvaart Maatschappij, 374 F.2d 189, the Third Circuit held that "[T]he opinion of an expert even if uncontradicted is not conclusive and a jury is not required to accept it. Such testimony must pass through the screen of the jury's judgment of credibility [citing cases]."

The jury may well have agreed with the experts as to what would happen in the use of a non-defective cartridge but found itself unable to get around the fact that a cartridge which should have fired instantaneously simply did not do it. In other words, viewing the evidence as a whole the cartridge irrefutably had to be defective or it would not have fired in the abnormal manner sworn to by the plaintiff. It is said that according to the laws of science it should be impossible for a bumblebee to fly, but it flies nevertheless.

On the other hand, the jury may well have reasoned that if it were scientifically impossible for a cartridge to explode in the manner claimed by the plaintiff then it would be rather unnecessary for the Remington Company, and the industry as a whole, to have a rule requiring test firing employees to wait a minimum of thirty seconds before ejecting a misfired cartridge. Nor would there be any point in requiring its employees to wear safety glasses while handling these cartridges.

The evidence shows without dispute that the cartridge boxes carried no warning of the danger involved in attempting to withdraw a misfired or a hungfired cartridge.

We are of the further opinion that appellant's contentions as to a quotient verdict and as to an excessive verdict are not due to be sustained.

Affirmed.