**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Larry Gene BONITZ, a/k/a Gerald**
**Wayne Guinn, Defendant-Appellant.**

No. 85–2616.

United States Court of Appeals,
Tenth Circuit.

Aug. 14, 1987.

Irven R. Box (Diane Clowdus, with him, on brief), Box & Clowdus, Oklahoma City, Okl., for defendant-appellant.

Robert Mydans, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., and Mark D. McBride, Asst. U.S. Atty., on brief), for plaintiff-appellee.

Before McKAY, SETH and BALDOCK, Circuit Judges.

McKAY, Circuit Judge.

This case began when Bureau of Alcohol, Tobacco and Firearms agents, assisted by Oklahoma City Police Department officers, went to the home of defendant's parents to arrest him pursuant to an arrest warrant. The warrant was issued on a claim that defendant had violated 18 U.S.C. § 922(a)(6) (1982) by giving false information in connection with acquiring a firearm. The false information claim was based on a belief that defendant had failed to acknowledge a felony conviction on the applicable BATF forms. The validity of the warrant is not in question in this case.

After entering the home, the arresting agent and at least three other officers found defendant in the doorway of his bedroom in the presence of his parents. Within one or two minutes from the time the law enforcement officials entered the home, defendant was handcuffed with his hands behind him and was in custody.

For approximately the next two-and-one-half hours, a search and seizure was conducted within the ten-foot-by-ten-foot confines of defendant's bedroom. Defendant's possessions were systematically searched, seized and inventoried without a warrant and without consent of defendant or his parents. Three of the seized items—a Colt AR–15 rifle, an M–16 bolt carrier assembly, and two drop-in sear kits—were the subject matter of a motion to suppress. Defendant now appeals the denial of this motion. These items were used as the basis for the underlying conviction for possessing a combination of parts for use in converting a firearm into an unregistered machine gun in violation of 26 U.S.C. § 5861(d) (1982).

The Colt AR–15 rifle was located in a closed, hard plastic case underneath a workbench in defendant's bedroom, along with other, soft-sided, gun cases. Record, vol. 2, at 31, 36. Officers testified that they observed this hard case not far from

the defendant at or about the time he was arrested and handcuffed, but did not seize it until after defendant was. handcuffed. Record, vol. 2, at 32. After officers opened this case, they observed that a rifle was inside.

Officers testified that they could recognize this case as a gun case. However, the trial court described the case in this way: "I wouldn't recognize it as a gun case, from what I know of gun cases.... This may be just as suspicious from people that are around guns more than I, but it could equally be suspected of carrying a violin or something like that." Record, vol. 2, at 64. Thus, this particular case did not, in and of itself, disclose a rifle lying inside and, from its outward appearance, might have contained camera equipment or technical instruments instead.

The M–16 bolt carrier assembly was located on top of an envelope on top of the workbench. Testimony indicates that the bolt carrier assembly was observed in plain view at or about the time of the arrest and handcuffing of defendant but that it was not actually seized until sometime later. Record, vol. 2, at 34, 51–52.

The two sear kits were found inside plastic envelopes located in a small file box on top of the workbench. These items, necessary to convert the AR–15 rifle and the bolt assembly into a fully automatic weapon, were not discovered until after the room had been secured and the defendant had been removed from the vicinity. The officer testified, "We could have kept the room secured, yes, Your Honor." Record, vol. 2, at 43–44. Nevertheless, an exhaustive search was conducted without waiting for the issuance of a search warrant. All bedroom items, including envelopes and the pages of books, were examined. Nothing indicates that the sear kits could have been seen or recognized without this search.

■ The Government uses alternate bases to justify its warrantless search and seizure of the three disputed items. First, it claims that the AR–15 rifle was properly seized incident to defendant's arrest. *See Chimel v. California*, 395 U.S. 752, 762–63, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969). However, the case containing the AR–15 rifle was searched after defendant was handcuffed and in custody and, thus, this search was not conducted in order to disarm defendant or to protect the safety of the officers. *See id.* at 763, 89 S.Ct. at 2040. Additionally, no serious claim has been made that destruction of evidence was feared.

Second, the Government advances the well-recognized plain-view doctrine to support the seizure of both the AR–15 rifle and the M–16 bolt carrier assembly. The case containing the AR–15 rifle was in plain view, and the record supports the trial court's conclusion that the case gave probable cause to suspect its contents. Even so, it is not clear that the officers could open the case to examine its contents without a search warrant. A footnote in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), suggests that some containers such as gun cases may, by their very nature, support an inference as to their content from their outward appearance. *Id.* at 764–65 n. 13, 99 S.Ct. at 2593 n. 13. However, a gun case was not at issue in *Sanders*, and a specific ruling on whether a gun case places its contents into plain view has not occurred. Given the characteristics of this particular case, the issue is even more ambiguous. This hard plastic case did not reveal its contents to the trial court even though it could perhaps have been identified as a gun case by a firearms expert. Thus, in contrast to the well-known soft, zippered gun cases, the applicability of the *Sanders* dicta on gun cases remains very doubtful. *See United States v. Rigales*, 630 F.2d 364, 367–68 (5th Cir.1980) (no indication that bulge inside zippered brief case resembled a pistol and, thus, facts not within purview of *Sanders* footnote); *United States v. Dart*, 747 F.2d 263, 269 (4th Cir.1984) (weapons underneath an opaque blanket not in plain view); *United States v. Moschetta*, 646 F.2d 955, 958–59 (5th Cir. Unit B June 1981) (*Sanders* does not imply an " 'unworthy container' exception" and, thus, search of "any closed opaque container whose exterior or

shape does not disclose its probable contents" requires a warrant).

■ It is fundamental that, absent some special exception, all containers and packages will receive the full protection of the fourth amendment during a police search. *Sanders*, 442 U.S. at 762–65, 99 S.Ct. at 2592–93. The trial court itself observed that a great many things could have been contained in the case at issue here. While the officers' knowledge of gun cases may well have formed the basis for the issuance of a warrant by a detached magistrate, only the soft-sided gun cases could self-reveal the presence of a weapon inside. Therefore, the record here does not support the conclusion that the AR–15 rifle was in plain view, and it should have been suppressed.

■ The evidence does support the claim that the M–16 bolt carrier assembly was in plain view at the time the officers lawfully arrested defendant. Although it is somewhat problematic whether the requirement that its incriminating nature be "immediately apparent" was satisfied, *Coolidge v. New Hampshire*, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), the bolt carrier assembly arguably formed a link in the chain of possession of a weapon by a felon, and could thus be seized.

■ However, even if the bolt assembly and the AR–15 rifle could be seized under the plain view doctrine, it is clear beyond doubt that the record does not support a finding that the sear kits located in plastic envelopes, inside a file box, were in plain view. Thus, absent some other exception, discovery and seizure of the sear kits without a search warrant was unlawful and those items must be suppressed. *Arizona v. Hicks*, — U.S. ——, 107 S.Ct. 1149, 1152–53, 94 L.Ed.2d 347 (1987) (moving and inspecting items in apartment separate from search giving lawful entry constitutes additional invasion of privacy).

■ The Government attempts to justify the search resulting in seizure of the sear kits on the basis of exigent or emergency circumstances. After defendant's arrest, a can of black powder with other ammunition reloading materials, and a hand grenade which later proved to be a dead paperweight, were seen on top of the workbench. Further examination revealed up to twenty-two cans of black powder in the room. At that stage, the officers ceased all other activity and called a bomb technician. The Government claims that the subsequent prolonged and precise search was justified by their fear that the explosives threatened the neighborhood, including residences and a restaurant two doors away. Record, vol. 2, at 46–47, 61–62.

Even though the trial court accepted the exigent circumstances justification, the record simply does not support such a conclusion. The witness who identified the black powder testified that it was of the type legally and routinely seen in bullet reloading shops in quantities "up to maybe ten" cans. Record, vol. 2, at 59. Standing undisturbed, cans of gun powder are inert, whether in a gun reloading shop or in a home. Similarly, the hand grenade paperweight was not illegal and, even when live, a grenade is not dangerous unless disturbed. Thus, the only immediate danger that existed was created by the officers themselves when they entered the secure area and began to handle these materials. *See United States v. Hultgren*, 713 F.2d 79, 86 (5th Cir.1983) (warrantless search not justified when exigent circumstances created by government agents).

The Government's claim that they believed exigent circumstances were present smacks of pure unadulterated pretext. The prolonged inventory-type search required a total of approximately two hours, long enough to examine books and manuals one page at a time. Officers other than the bomb technician remained in or about the room throughout the search. Even more significant, the officers made no attempt to remove defendant's parents from the home even though they now have the audacity to claim that the danger was such to threaten a restaurant some distance away. Similarly, at no time during this prolonged search were neighboring residences or business establishments evacuated or warned that the risk of an explosion

existed. In view of their lack of concern for their own safety and that of others, we are unconvinced that the officers apprehended an emergency which justified this extensive examination of a room without a search warrant.

On the record, we hold that the officers properly seized the bolt assembly under the plain-view doctrine. However, notwithstanding the dicta in *Sanders*, the record does not support a conclusion that the presence of the hard plastic case revealed the existence of the AR–15 rifle, and this evidence must be suppressed. More clearly, the sear kits are suppressible. The record simply does not support the conclusion that exigent circumstances justified the exhaustive search which eventually uncovered these two items.

Into the writing of the fourth amendment was poured the living experiences of early Revolutionaries struggling for independence. Deeply troubled by police searches of homes and offices, and realizing the inherent temptations and persistent dangers of abuse, the Founding Fathers placed the fourth amendment into the Constitution. *Davis v. United States*, 328 U.S. 582, 603–06, 66 S.Ct. 1256, 1266–67, 90 L.Ed. 1453 (1946) (Frankfurter, J., dissenting). The Supreme Court has stated:

"We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals.... And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."

*Chimel*, 395 U.S. at 761, 89 S.Ct. at 2039 (quoting *McDonald v. United States*, 335 U.S. 451, 455–56, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)).

While the gun case and the various potentially explosive items gave probable cause to seek a search warrant from a detached and neutral magistrate, the circumstances do not excuse the actions of law enforcement officials when they undertook a search and seizure without obtaining such a warrant.

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

*Mincey v. Arizona*, 437 U.S. 385, 395, 98 S.Ct. 2408, 2415, 57 L.Ed.2d 290 (1978) (quoting *Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 368–69, 92 L.Ed. 436 (1948)).

The search incident to an arrest doctrine is not a panacea. It only puts the officers legitimately on the premises and in a position to exploit certain exceptions. These exceptions permit officers to take steps in order to protect their own safety during the arrest, to preserve evidence found lying in plain view, and to respond to emergency situations. It is clear that the court misapplied all three doctrines as they related to the opening and seizing the contents of the gun case and the search, discovery and seizure of the sear kits. Although the M–16 bolt carrier assembly was properly seized, the AR–15 rifle and the two sear kits used in obtaining the conviction should have been suppressed.

REVERSED and REMANDED for further proceedings consistent with this opinion.

BALDOCK, Circuit Judge, dissenting:

The majority concludes that the seizure of the AR–15 rifle, which was located in a gun case approximately three feet from defendant at the time of his arrest, cannot be justified under the search incident to arrest or plain view exceptions to the fourth amendment warrant requirements. The majority also concludes that the presence of approximately 23 cans of gunpowder and a hand grenade did not constitute exigent circumstances which would allow a warrantless search of the room by the bomb squad. In reaching this latter conclusion, the majority finds, contrary to the trial judge who conducted the suppression hearing, that the claim of exigent circumstances by the officers was mere pretext. Because I cannot agree with the conclusions or the rationale set forth in the majority opinion, I must respectfully dissent.

In denying the motion to suppress, the district court noted that the "search ... was incident to [a] valid arrest and that the items seized were all in plain view of the officers who were lawfully on the premises." Rec. vol. I, document 23 at 3. The district court went on to state that "[t]he second part of the search by the bomb squad was a valid search" due to the potentially hazardous situation created by the presence of the grenade and gunpowder. The majority rejects each of the district court's conclusions.

The majority first addresses the seizure of the AR–15 rifle, rejecting both the search incident to arrest and plain view doctrines as justification for the warrantless search and seizure. In addressing the search incident to arrest issue, the majority holds that the search is not excepted from the warrant requirements because the defendant was handcuffed at the time of the search. The majority thus concludes that the rifle was not in the area of the defendant's immediate control at the time of arrest as required by *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969).

Pursuant to *Chimel,* the permissible area which may be subject to a valid search incident to arrest is "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Id.* The Supreme Court, in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), has defined this area within the immediate control of the arrestee as including the pockets of a jacket within the passenger compartment of an automobile in which the arrestee was an occupant, although the arrestee no longer has access to that passenger compartment. In *Belton,* the Court rejected the New York Court of Appeals' conclusion that no valid search incident to arrest occurred where "there is no longer any danger that the arrestee or a confederate might gain access to the article." *Id.* at 456, 101 S.Ct. at 2862. The Court concluded that, as a matter of law, the passenger compartment of the car was "in fact generally, even if not inevitably, within" the arrestee's immediate control. *Id.* at 460, 101 S.Ct. at 2864. In allowing the search of a container (a jacket), the Court relied upon its earlier statement in *Chimel* that drawers within an arrestee's reach could be searched, and stated that "the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have" in the container. *Id.* at 461, 101 S.Ct. at 2864.

Although *Belton* dealt specifically with the passenger compartment of an automobile, I believe that the principles set forth in that case are applicable here. In the present case, the gun case was located only three feet from defendant at the time of his arrest and at the time of the search and seizure. Although the fact that defendant was handcuffed immediately prior to the search indeed limits his access to the gun case, the case was still generally, if not inevitably, within his immediate control. As in *Belton,* the opening and subsequent search of the gun case is also justified as part of the search incident to arrest.

The majority also rejects the plain view doctrine as justification for the warrantless seizure of the AR–15 rifle. The majority concedes that "[t]he case containing the AR–15 rifle was in plain view, and the record supports the trial court's conclusion that the case gave probable cause to sus-

pect its contents." The majority concludes, however, that the rifle itself was not in plain view, and its seizure thus violated the fourth amendment. I cannot agree.

As the majority notes, the Supreme Court in Arkansas v. Sanders, 442 U.S. 753, 764–65 n. 13, 99 S.Ct. 2586, 2593 n. 13, 61 L.Ed.2d 235 (1979), stated:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance.

The majority refuses to apply this language to the present case, stating that Sanders did not specifically involve a gun case and drawing a distinction between the hard gun case involved in this case and a soft-sided gun case.

While the facts of Sanders did not involve a gun case, I believe that the reasoning employed by the Court in the footnote is sound and persuasive. Certainly, where the contents of a container are apparent from the very nature of the container itself, there is no reasonable expectation of privacy as to those contents. Robbins v. California, 453 U.S. 420, 427, 101 S.Ct. 2841, 2846, 69 L.Ed.2d 744 (1981).[1] Cf. United States v. Jacobsen, 466 U.S. 109, 120, 104 S.Ct. 1652, 1660, 80 L.Ed.2d 85 (1984). Furthermore, under the facts of this case, I am reluctant to draw a distinction between a hard, plastic gun case and a

soft-sided gun case for the purpose of inferring the contents.

The trial judge did express some concern as to his ability to recognize the plastic case as a gun case. However, the search was conducted by experienced officers who had knowledge of defendant's felony conviction and acquisition of firearms, and who observed the hard plastic case among several soft-sided gun cases. The experienced officers were able to recognize the plastic case as a gun case, and could thus reasonably infer its contents. Robbins v. California, 453 U.S. at 427, 101 S.Ct. at 2174. See also United States v. Walsh, 791 F.2d 811, 816–17 (10th Cir.1986) (trained BATF agents had probable cause to believe briefcase contained contraband); United States v. Rose, 695 F.2d 1356, 1358 (10th Cir.1982), cert. denied, 464 U.S. 836, 104 S.Ct. 123, 78 L.Ed.2d 121 (1983) (federal firearms agents recognized potentially incriminating evidence). As noted above, the majority admits that there was probable cause to suspect the contents of the plastic case. The trial court obviously found that the plastic case was sufficiently recognizable as a gun case to allow an inference as to its contents. I would therefore hold that the seizure of the AR–15 rifle was not unreasonable, and did not violate defendant's fourth amendment rights.

I agree with the majority's conclusion that the seizure of the M–16 bolt carrier assembly was valid.

1. The Court in Robbins held that containers found in the course of a lawful search of an automobile could not be opened without a warrant. In reaching its conclusion, the Court interpreted footnote 13 in Sanders (quoted above) as standing for the proposition that "if the distinctive configuration of a container proclaims its contents, the contents cannot fairly be said to have been removed from a searching officer's view." Robbins, 453 U.S. at 427, 101 S.Ct. at 2846. The Court relied on the implication from the Sanders footnote that "unless the container is such that its contents may be said to be in plain view, those contents are fully protected by the Fourth Amendment." Id.

The precise holding of Robbins, as well as the portions of Sanders relied on therein, were overruled in United States v. Ross, 456 U.S. 798,

102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The Court in Ross concluded that, once officers have probable cause to believe an automobile is carrying contraband, such probable cause justifies the search of every part of the automobile and its contents, including containers, that may conceal the object of the search. Id. at 825, 102 S.Ct. at 2173. Thus, Ross employs a test as to when containers in an automobile may be searched that no longer relies upon a finding that the nature of the container reveals its contents. Ross does not, however, alter the rationale set forth in Sanders and Robbins that there is no reasonable expectation of privacy in the contents of a container where the nature of the container discloses those contents to the officers.

The majority next reverses the district court's holding that the warrantless search by the bomb squad resulting in the seizure of the sear kits was reasonable because of the presence of exigent circumstances. The majority thus overturns the district court's finding of exigent circumstances due to the presence of 23 cans of gunpowder and a grenade in defendant's ten by ten foot room.

In an effort to justify its reversal of the district court's findings, the majority attempts to downplay the dangerous nature of the explosives located in defendant's room. The majority points out that the witness who identified the powder as gunpowder testified that it was of the type legally and routinely seen in bullet reloading shops in quantities "up to maybe ten" cans. The majority, however, offers no basis from which to conclude that the quantities of gunpowder found in the reloading shops are not themselves potentially dangerous. Moreover, in the present case, the agents were faced with the presence of 23 cans. The quantity of gunpowder found in defendant's room was thus more than twice that generally found in a professional reloading shop. Also, the gunpowder was in the immediate proximity of a grenade and several gun cases. The agents' attempts to ascertain from defendant whether the grenade was live proved fruitless.

The majority minimizes the presence of what, until today, I would have considered an obvious danger by boldly stating that "[s]tanding undisturbed, cans of gunpowder are inert, ... and, even when live, a grenade is not dangerous unless disturbed." In making these remarkable statements, the majority holds, as a matter of law, that standing quantities of gunpowder and grenades are not to be considered dangerous. It hardly seems necessary to say, but this approach is at odds with that taken by various courts in dealing with the dangerous propensities of both gunpowder and grenades. *See, e.g., United States v. Freed,* 401 U.S. 601, 609, 91 S.Ct. 1112, 1118, 28 L.Ed.2d 356 (1971) ("[grenades] are highly dangerous offensive weapons"); *Stewart v. United States,* 186 F.2d 627, 631 (7th Cir.), *cert. denied,* 341 U.S. 940, 71

S.Ct. 1000, 95 L.Ed. 1367 (1951) ("[t]hat [the grenades] were an explosive calculated to do great harm is not open to question"); *Remington Arms Co., Inc. v. Wilkins,* 387 F.2d 48, 50 (5th Cir.1967) ("[t]he [Alabama Supreme] Court stated in the course of the opinion that gunpowder [naming others] is an inherently dangerous article"); 31 Am. Jur.2d *Explosions and Explosives* § 105 (1967) ("the court will take judicial notice of the dangerous qualities of certain substances, such as gunpowder, dynamite, or the like." (footnotes omitted)). Due to the inherently dangerous propensities of both the gunpowder and grenade, I cannot accept the majority's condescending conclusion that "the only immediate danger that existed was created by the officers themselves."

More importantly, I am unwilling to overturn the district court's factual determination as to the presence of exigencies and the actual motives of the agents. The majority makes the finding that the agents' belief that exigent circumstances existed due to the presence of the explosives was "pure unadulterated pretext." The majority goes on to find that the agents did not actually believe a potentially dangerous situation existed that would justify a warrantless search, and any claim to the contrary by the agents was false. However, the district court which conducted the suppression hearing and heard the testimony of the officers involved obviously found that the agents did believe exigent circumstances were present. The district court had the unique opportunity to hear the testimony and judge the credibility and demeanor of the witnesses. My review of the record confirms that there was indeed sufficient evidence to support the district court's finding of exigent circumstances, including the agents' actual perception of those circumstances. I thus cannot join in the majority's independent determinations, based solely upon its review of a cold record, as to the motive, intent, or credibility of the agents regarding their perception of the situation. I likewise cannot join in the majority's reversal of the district court's factual determinations.

As to the exigent circumstances issue, I would defer to the findings of the trial

court, which are supported by evidence and logic, that the officers indeed perceived a dangerous situation. I disagree with the majority's holding that, as a matter of law, 23 cans of gunpowder, a hand grenade, and various rifles cannot be considered a potentially dangerous situation so as to call in the bomb squad and conduct a warrantless safety search. I would thus affirm the trial court's determination that the search by the bomb squad was justified due to the potentially hazardous situation with which they were presented. *United States v. Echegoyen*, 799 F.2d 1271, 1278 (9th Cir. 1986); *United States v. Newton*, 788 F.2d 1392, 1394 (8th Cir.1986).

The two sear kits were discovered by the bomb specialists when they were searching for additional explosives. The sear kits were properly seized because they were recognized as parts used in converting a rifle into a machine gun. Because the sear kits were evidence of a crime and were found inadvertently during a valid search, they were properly seized. *Coolidge v. New Hampshire*, 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971).

I would affirm the district court's decision that the AR–15 rifle, the bolt assembly, and the sear kits should not be suppressed.