**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Kerry Neil JUSTICE,**
**Defendant–Appellant.**

No. 86–1781.

United States Court of Appeals,
Tenth Circuit.

Dec. 29, 1987.

William P. Earley, Asst. Federal Public Defender, Oklahoma City, Okl., for defendant-appellant.

Stephen J. Korotash (William S. Price, U.S. Atty., Oklahoma City, Okl., with him on the brief), Asst. U.S. Atty., Oklahoma City, Okl., for plaintiff-appellee.

Before McKAY, TACHA, and BALDOCK, Circuit Judges.

TACHA, Circuit Judge.

Kerry Justice was indicted for possessing an unregistered machine gun in violation of 26 U.S.C. § 5861(d). The district court overruled Justice's motion to suppress the weapon as evidence at trial, and Justice now appeals. We affirm.

On the morning of November 30, 1985, officers from the Oklahoma City Police De-

partment responded to a report of a shooting incident at the defendant's address. Officer Gates, who was the first to arrive, observed a juvenile shooting a gun in the front yard. The young man told the officer that two large snakes had "gotten out," that they had gone under the house, and that they were scaring hundreds of smaller snakes up through the floor and under the carpet. The juvenile said that he was shooting the snakes that had left the house.

Officer James, who arrived later, went to the door to see if anyone was at home and if the shooting had injured anyone. He found that the front door had been damaged; it appeared to have been recently kicked in. Because of the shooting and the condition of the door, the officer thought the home may have been burglarized, possibly by the juvenile. He decided to enter without a warrant in order to check for injured persons. To avoid further damaging the door by entering through it, James sought another entrance. He found that the garage door was open about eight inches. Upon opening the garage door, Officer James saw approximately eighteen yellow plastic cylinders marked "Explosives" near the door into the house. He did not further investigate the garage or its contents but continued to search for individuals.

The officer entered the residence and observed that lights were on in the den area. The television was playing loudly, and the fireplace was being used. As he walked through the house, Officer James noticed more explosives in the kitchen and living room. He also saw the handle of a gun protruding from underneath a bed in one of the bedrooms.

After the check for injured persons was complete, the officers sought to neutralize the danger they felt was posed by the large amount of explosives on the premises and immediately called for assistance from the police department's bomb squad. Sergeant Windle of the bomb squad arrived shortly thereafter. Officer James took him to the garage and pointed out the explosives. Windle examined the yellow sticks. He testified at the suppression hearing that they were Thermax–100 and that each stick was three times as powerful as a stick of sixty percent dynamite. In the box with the Thermax–100, Windle found electric squibs, which are devices used to detonate the explosives. It is unsafe to store squibs together with explosives. Sergeant Windle separated these items.

Windle also discovered other explosives in the garage. In particular, he noticed two one-pound Atlas oil field charges which he characterized as "extremely dangerous." He moved them to a safe location. On a shelf he saw another stick of Thermax–100 and a squib with its wires separated. Sergeant Windle testified that this forms an antenna which allows the explosive to be set off by a radio transmission. The officer put the wires together to neutralize the danger.

Within the residence itself Sergeant Windle saw several more sticks of Thermax–100 in various rooms as well as several items normally used in making bombs (a wind-up alarm clock, a battery, explosive powders, and duct tape). While looking for more explosives, the officers found a snake and also came upon the machine gun involved here, the handle of which was protruding from under a bed. The officers inspected the gun and determined that it was a machine gun.

The defendant asks us to hold that inspecting the gun without a warrant was an unreasonable search which violated the fourth amendment. The government contends that seizure of the gun was justified under the "plain view" exception to the warrant requirement. The district court refused to suppress the evidence.

"At a hearing on a motion to suppress, the credibility of the witness and the weight to be given the evidence together with the inferences, deductions and conclusions to be drawn from the evidence, are to be determined by the trial judge." We are therefore "bound by the trial court's determinations unless they are clearly erroneous." *United States v. Pappas,* 735 F.2d 1232, 1233 (10th Cir.1984).

The district court held that the warrantless search of the weapon was justified under the plain view exception to the warrant requirement. In *United States v. Gabriel*, 715 F.2d 1447 (10th Cir.1983), we set forth the requirements for a legitimate plain view search. There we held that "[a] warrantless search may be justified under the plain view doctrine if the government shows that 'the initial intrusion which afforded the plain view was lawful, that the discovery was inadvertent, and the incriminating nature of the evidence was immediately apparent.'" *Id.* at 1449–50 (quoting *United States v. Tolerton*, 669 F.2d 652, 654 (10th Cir.), *cert. denied*, 456 U.S. 949, 102 S.Ct. 2020, 72 L.Ed.2d 473 (1982)).

The first requirement is satisfied here. Officer James's initial warrantless entry into the Justice home was justified by exigent circumstances. The police were confronted with a bizarre situation. They reasonably feared that the juvenile may have injured someone in the home.

In his findings of fact, the district judge accepted Officer James's explanation regarding his motives. The judge found that "Officer James entered the house looking for possible victims." This bona fide check for injured persons did not constitute an unreasonable search under the fourth amendment. "[T]he Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Arizona*, 437 U.S. 385, 392, 98 S.Ct. 2408, 2473, 57 L.Ed.2d 290 (1978).

Once properly inside the house, Officer James observed a large number of explosives in plain view. He also saw the handle of a gun. Rather than investigating further, which could have escalated the danger presented by the explosives, James called experts to the scene.

We hold that the presence of large amounts of explosives provided justification for the entry of the bomb squad. We also hold that the bomb squad's actions inside the home were closely tied to its purpose for entering and were in no way motivated by mere "curiosity." *See United States v. Dart*, 747 F.2d 263, 268 (4th Cir.1984). Having discovered "extremely dangerous" oil field charges, an explosive capable of being set off by a radio transmission, squibs stored together with explosives, and several items commonly used in making bombs, Windle was justified in searching the area for additional dangerous explosives.

As the Eighth Circuit pointed out in *United States v. Jones*, 635 F.2d 1357, 1361 (8th Cir.1980), there can be no "absolute test for the presence of exigent circumstances, because such a determination ultimately depends on the unique facts of each controversy." It is for this reason that our recent decision in *United States v. Bonitz*, 826 F.2d 954 (10th Cir.1987), is not controlling. In that case officers spent "two-and-one-half hours" searching a "ten-foot-by-ten-foot" bedroom. "All bedroom items, including envelopes and the pages of books, were examined." *Id.* at 956. The government attempted to justify its search in *Bonitz* on the basis of exigent circumstances because some gun powder and a hand grenade paperweight were found in the room. The court noted that these items "are not dangerous unless disturbed," *Id.* at 957, and held that the record "simply does not support the conclusion that exigent circumstances justified the exhaustive search" that took place. *Id.* at 958.

Here we face a different set of circumstances. While the items uncovered by the police in *Bonitz* were "not dangerous unless disturbed," the officers in this case found explosives capable of being detonated by radio transmission. While the protracted and exhaustive search in *Bonitz* was not justified by the gravity of the situation, the officers in this case went no further than was necessary to assure themselves that other dangerous explosives or bombs were not present. From the moment Officer James arrived, "the police were busily engaged in solving the problem, which they continued to believe was a dangerous one." *Jones*, 635 F.2d at 1361. They did not stop to "examine books and manuals one page at a time," *Bonitz*, 826

F.2d at 957, but proceeded carefully and in a manner proportionate to the perceived danger. We therefore hold that the initial entry in this case was lawful, thus satisfying the first *Gabriel* requirement.

Because the discovery of the machine gun was inadvertent, the second requirement for a legitimate plain view search is also met. The district court properly held that the "weapon in issue was in plain view" and that "the officers were lawfully searching the house when, by inadvertence, they came upon the firearm." This case turns, then, on the third requirement: whether the incriminating nature of the gun was immediately apparent.

It was immediately apparent to the officers that the object under the bed was a gun. No inquiry or examination was necessary or engaged in. We must therefore decide whether this particular gun was "of an incriminating nature."

We have held that objects are of an incriminating nature if they are "contraband, fruits or instrumentalities of crime, or clear evidence of criminal behavior." *United States v. Falcon*, 766 F.2d 1469, 1475 (10th Cir.1985) (quoting *United States v. Dichiarinte*, 445 F.2d 126, 130 (7th Cir. 1971)). Officers conducting a search must have probable cause to believe that the objects are of an incriminating nature. In *Falcon* we held that "agents were entitled to seize items that they had probable cause to believe were evidence of crime." *Id.* Probable cause is a flexible standard. As we noted in *United States v. Padilla*, 819 F.2d 952, 962 (10th Cir.1987), "[t]he officer's belief that he is presented with evidence of a crime need not be certain or even more likely true than false." It is enough if "a man of reasonable caution" would believe that the gun might be "useful as evidence of a crime." *Id.* (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983)).

In this case the officers had probable cause to believe that the gun was "evidence of criminal behavior." They thought a burglary had been committed and also that a bomb was being prepared. It was therefore not unreasonable for them to conclude that the weapon was probably associated with criminal activity. *See United States v. Meyers*, 827 F.2d 943, 945 (3d Cir.1987).

The Supreme Court's opinion in *Arizona v. Hicks*, — U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), does not require a different result. "In that case, the state conceded that the officers had no more than a reasonable suspicion that the stereo equipment in issue was stolen. The Court held that the application of the plain view doctrine requires probable cause, rather than reasonable suspicion, that the items seized are contraband. That standard is met here." *Meyers*, 827 F.2d at 945.

Given the fact that a juvenile had been shooting a gun in the front yard, large amounts of explosives were present, a bomb was being prepared, the door had been recently kicked in, and the house appeared to have been burglarized, we hold that the officers had probable cause to believe that the gun they saw was connected with criminal activity and may have been evidence of a crime.

AFFIRMED.

McKAY, Circuit Judge, dissenting:

I regretfully must dissent, but only from that portion of the panel opinion which concludes that there was probable cause to believe that the gun was connected with criminal behavior. Guns are common in American homes. While the court has recited a number of possible crimes at the scene, it has altogether failed to point to any probable nexus between them and the gun. If these disconnected recitations create probable cause as required by *Arizona v. Hicks*, — U.S. ——, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), then probable cause has ceased to have any significant meaning. It is the probable nexus that is missing. I would reverse.